1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAUL RALPH KOVACICH,                          No. 2:13-cv-0985 KJM DAD P

12                  Petitioner,

13        v.

14   M. E. SPEARMAN, Warden,                       FINDINGS AND RECOMMENDATIONS

15                  Respondent.

16

17        Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on January 27, 2009, in the Placer County Superior Court on charges of first

20   degree murder with use of a firearm.  He seeks federal habeas relief on the following grounds:

21   (1) there was insufficient evidence introduced at his trial to support his conviction for murder

22   with use of a firearm; (2) evidentiary rulings made by the trial court violated his right to due

23   process; (3) prosecutorial misconduct violated his right to due process; (4) jury instruction error

24   violated his right to due process; (5) incompetence and prejudicial behavior by law enforcement

25   authorities violated his federal constitutional rights; (6) witness tampering by a federal law

26   enforcement officer violated his federal constitutional rights; (7) his trial and appellate counsel

27   rendered him ineffective assistance; (8) he was not advised of his constitutional rights at any of

28   his police interrogations, in violation of the decision in Miranda v. Arizona, 384 U.S. 436 (1966);

                                                  1

(9) the prosecutor's suppression of evidence before the grand jury violated his federal constitutional rights; and (10) jury misconduct violated his right to a fair and impartial jury. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

## I. Background

In its published memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> In 1982, Janet Kovacich disappeared after telling her husband that she was leaving him and taking their two young children with her. The husband, defendant Paul Ralph Kovacich, Jr., was controlling and abusive in the marriage; he admitted to cheating on her and was seen in the arms of another woman within two days of her disappearance; he played no active role in searching for her despite the fact that he was a trained dog handler with the Placer County Sheriff's Department; and he told his new girlfriend that his wife "wasn't coming back." In 1995, a portion of Janet's skull was discovered near Rollins Lake, a place defendant had experience patrolling. The skull, which was not determined to be Janet's until 2007, had a hole that was consistent with an entrance wound caused by a gunshot from a large caliber handgun, similar to the weapon defendant had been issued as a law enforcement officer.

> More than 26 years after Janet's disappearance, a jury convicted defendant of first degree murder and found that he personally used a firearm during the commission of the crime. The trial court sentenced defendant to state prison for an indeterminate term of 25 years to life plus a consecutive determinate term of two years for the firearm enhancement.

> On appeal, defendant raises several contentions challenging the conviction: (1) the evidence was insufficient to support the conviction; (2) the trial court committed reversible error by admitting out-of-court statements that Janet feared defendant; (3) the trial court committed reversible error by admitting out-of-court statements that defendant kicked the family dog to death; (4) the trial court prejudicially erred by allowing expert testimony on intimate partner abuse and the prosecution engaged in misconduct by eliciting certain responses from the expert that violated an in limine ruling; (5) defendant's trial counsel rendered ineffective assistance by failing to proffer certain evidence purported to undermine the prosecution's case; and (6) the trial court prejudicially erred by excluding evidence that the chief investigator harbored a bias against defendant and by refusing a requested instruction that would have highlighted the defense theory that the murder investigation was not conducted in good faith. We disagree with each contention and affirm the judgment.

## FACTS

The circumstantial nature of the evidence requires that we set forth the facts of this case in unusual detail.  We do so in the light most favorable to the verdict, resolving all conflicts in its favor.  (People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal. Rptr.2d 23, 864 P.2d 103; People v. Vu (2006) 143 Cal. App.4th 1009, 1013, 49 Cal. Rptr.3d 765.)

### Background

Defendant and Janet were married in 1973.  Janet's parents, Leo and Jean Gregoire, did not approve of Janet's relationship with defendant and did not attend the wedding.[1]  The marriage produced two children.  Kristi was born in 1975.  John was born in 1977.  The family moved to Auburn in 1980.

Defendant worked as a sergeant in the Placer County Sheriff's Department.  He received a bachelor's degree in police science, completed a master's thesis entitled, "Case Study of the Development of a Police K–9 Unit," and was certified as a dog handler by the Commission on Peace Officers Standards and Training.  Janet was primarily responsible for raising the children and was a devoted and loving mother.  As Joyce White–Janoski, one of her closest friends, recalled:  "She had a very strong bond with [her children].  She was always hugging them.  They would be sitting on her lap.  She - her children were very important to her.  She built her life around her children."  Janet's older brother, Gary Gregoire, observed:  "She loved her children, and that was very, very, very important to her.  You can tell by the photos we just went through, Janet just loved the kids, and they were very - that was the most important thing in her life [was] her two children."  Glenda Shields, one of Janet's neighbors, also recalled:  "She was very caring, very devoted to her children, spent a lot of time playing with them, interacting with them."

### Marital Relationship

The relationship between defendant and Janet was marred by marital discord, including verbal and physical abuse.  Defendant routinely called Janet "stupid shit" and spoke to her in a demeaning tone.  He also criticized Janet's physical appearance, particularly the size of her breasts, something she was "very self-conscious about."

At times, defendant's disparaging words turned into physical violence.  On several occasions, Janet was observed with bruises on her arms.  On one occasion, while White–Janoski was at their house, defendant hit Janet with a large metal utility chain.  On another occasion, while boating at Rollins Lake, what began as a water fight ended with a welt on Janet's leg as defendant threw

---

[1]   For simplicity, members of the Gregoire family will be referred to by their first names or by their relationship to Janet.

handfuls of mud at her while she begged him to stop.  On another boating trip, defendant's close friend, Steven Kassis, cut his foot on some trash Janet had left on the boat; defendant responded by angrily shoving her into the water.

Defendant also exercised control over the marriage.  According to defendant's own account of the marriage, he "took the role of a parent" with respect to Janet.  Janet confirmed that she felt as though defendant "treated her more like his daughter rather than his wife."  During the fall of 1979, Janet took a human sexuality course at Sierra College and confided in her instructor that defendant was "very demanding and controlling," but that she was too afraid to leave him at that time because she thought defendant's position in law enforcement would enable him to keep the children.  According to Elaine Cunningham, one of Janet's neighbors, Janet was "very nervous all the time," particularly when defendant was on his way home because she "needed to be home when he came home."

In 1980, Janet's brother Gary took some leave time from his service in the Army to visit his parents.  During the visit, Gary and Janet went out to lunch together.  As they drove to the restaurant, defendant pulled them over in his patrol car.  Janet was "very nervous" as defendant approached the car.  When Gary asked why he had been pulled over, defendant responded that "he could pull [Gary] over when he wanted to," and that if Gary disagreed, defendant could "find something wrong with the car" and write him a ticket.  Gary did not argue with defendant, who walked back to his patrol car and waited for Gary to drive away.  Gary and Janet continued to the restaurant, where Janet told her brother that she was "concerned" about her marriage to defendant and felt as though he monitored her movements.

In December 1981, Janet told Gary that "she didn't feel like she loved [defendant] anymore, that the relationship was not what she wanted in her life."  She also said that she planned to leave defendant and was embarrassed by the fact that her family had warned her not to marry him.  At the beginning of 1982, she told Gary that "she wished that she would have gone to school and gotten her degree and did things like that."  Around this time period, she also told one of her friends, Christine Milam, that she was "miserable" in her marriage, "afraid" of defendant, and that she "wanted to leave [him]."  Milam witnessed firsthand defendant's controlling and abusive behavior during a trip to the movie theater with Janet, Milam's son, and Janet's children.  As Milam described: "[Defendant] followed [them] all the way to the movies, and he came barreling up in his truck behind [them].  He jumped out of the truck, grabbed ahold of [Janet], was screaming profanities at her."  Milam held her son and Janet's children away from the confrontation while defendant dragged Janet a short distance.  Janet was "[c]rying, upset, scared to death."

**Death of the Family Dog**

Defendant's abusive behavior extended to the family dog.  He and Janet owned two German Shepherds, Adolph and Fuzz.  Adolph

4

was defendant's police dog and Fuzz was the family dog.   In August 1982, about a month before Janet disappeared, Fuzz was taken to the veterinary clinic in critical condition.  The dog died on the examination table, "reflexively gasping [for air] because its brain [was] deprived of oxygen and blood."   As defendant explained the events leading up to Fuzz's death, the dog got into some garbage and defendant kicked the dog several times in order to discipline the animal.  He admitted that he "went overboard," but denied causing the dog's death.  He also admitted that Janet and the children witnessed the assault, as they had on numerous prior occasions.

Janet believed that Fuzz's death was caused by the beating.   In tears, she told her brother Gary about the dog's death and explained that "she was starting to feel threatened at home, and she was worried for her safety, and she was worried for Kristi and John." At a Placer County Deputy Sheriff's Association barbeque, Janet cried as she told Gail Easter, the wife of another Placer County Sheriff's Department sergeant, that defendant had kicked the dog to death and that she was "very frightened" of defendant.  She also told Frances Myres and Glenda Shields, two of her neighbors, that defendant had kicked the dog to death.   Myres described her demeanor as "very sad and very upset."   Shields described it as "hysterical, crying, extremely distraught."

**Janet's Decision to Leave Defendant**

Janet decided to leave defendant shortly after Fuzz's death.  While she had left defendant twice before, this time her resolve appeared to be stronger.   She enrolled in pre-nursing courses at Sierra College two days after the dog died.  Janet also called a close friend, Kim Johnson, discussed her marital problems, asked how Johnson had ended her marriage, and asked for the name of Johnson's divorce attorney.  She then asked whether she could stay with Johnson, which left Johnson with the impression that she was "setting up a network of places she could go if she left [defendant]."

Janet also told her friend White - Janoski: "I'm finally going to leave [defendant].  I am really going to do it this time."   She explained that she wanted to leave because defendant was demeaning and abusive towards her, and that she also planned to take the children when she left.  Janet talked about going back to school and sounded "more confident" and "more like her old self." About the same time, Janet began researching the prospect of removing Kristi and John from their current school, St. Joseph's Catholic School, and placing them in a different private school, Forest Lake Christian School.

About a week later, Janet called her brother Gary and informed him that she planned to leave defendant, go back to school, and move herself and the children out of the house they shared with defendant. She also told Gary that she planned to change the children's school.  According to Gary, his sister sounded "more sure of herself" during this conversation.

**The Days Leading up to Janet's Disappearance**

In September 1982, six days before she disappeared, Janet had breast augmentation surgery. Janet was "bright and cheerful" and told the surgeon that she would be enrolling her children in a new school the following week, and would be going "back to college herself." Following the procedure, she was informed that recovery would take at least six weeks, and that she should restrict the movement of her arms and refrain from driving. The next day, Janet returned to the surgeon for a follow-up appointment and seemed "pleased with the results." Two days before she disappeared, Janet told a friend, Jeannette Baldwin, that she was "excited about going back to school" and also mentioned that she was transferring her children from St. Joseph's to Forest Lake, but "was anticipating a conflict" with defendant.

The day before Janet disappeared, which was the day after Labor Day and the first day of school at St. Joseph', Janet spoke to Janice Reynolds-Gage, another parent at the school who had left an abusive relationship of her own. Janet shared that "she felt emotionally and mentally abused, that there was taunting going on in her relationship about her appearance," that she "had some plastic surgery done and was going to have further plastic surgery done" because "she was feeling fairly low in self-esteem," and that she was "frightened" of defendant and "considered filing a restraining order against [him]." That night, Janet spoke to her neighbor Myres on the phone and told her that she was "excited about going [to school], anxious to get going on it, and looking forward to a new phase in her life, a career, and the fun of going back to school and a career and making something important of herself."

Meanwhile, during the early morning hours the day before Janet disappeared, defendant had finished his Labor Day shift patrolling the California State Fair and was attending a law enforcement party in celebration of "getting through the fair." At the party, defendant was seen "embracing and kissing" another woman. This was not the first time defendant had ventured outside the marriage. Defendant himself admitted to having sexual encounters of the "one night stand" variety with other women.

**Janet's Disappearance**

On September 8, 1982, the morning Janet disappeared, her children were picked up for school around 8:00 a.m. by Brenda Krch, one of Janet's neighbors and participant in a multi-family carpool arrangement. Around 9:00 a.m., Janet called Forest Lake Christian School and told Marion Entz, the registrar, that she wanted to enroll her children in the school, but because of her recent surgery, she could not drive herself and would need to call back to schedule an appointment when she had secured a ride. About an hour later, Janet called back, told Entz that she had found a ride to the school, and scheduled an appointment for 11:10 a.m. Janet neither showed up for the appointment nor cancelled it. She was never seen again.

According to defendant's version of the morning's events, told to homicide detectives a week later, after the children were picked up for school, Janet went upstairs to their master bedroom, where defendant was still in bed, and began to do her hair and makeup in the master bathroom.  She then started yelling about her father "going out on [her] mother" and "drinking again."  Defendant told her to "give the guy a break," and said, "he's got cancer . . . .  I'm sure he doesn't have all that much longer to live."  He then got up and began to get ready for the day.

According to defendant, a short time later, Janet told defendant that she was "unhappy" with their marriage, but offered no specific grievances.  Defendant, feeling "a little cocky" because "a couple girls looked at [him]" while he was at the State Fair, suggested that they get a divorce.  As defendant explained, he wanted to "beat her to the punch and . . . mentally push her in a corner to see how serious" she was about leaving.  After some "vague back and forth," Janet agreed to a divorce and they calmly discussed property division, custody of the children, and visitation rights.  After a pause in the discussion, Janet brought up changing the children's school from St. Joseph's to Forest Lake.  Defendant nonchalantly agreed, "again pushing her in a corner."  Janet then made two phone calls to Forest Lake.  After the first phone call, defendant offered to drive Janet to the school, but she refused explaining that she would get her own ride.  She then called the school again and scheduled an appointment for 11:15 a.m.  Defendant assumed that Janet's mother would be taking her to the appointment and left to run some errands.

The next time defendant's location was confirmed by a witness was after 11:30 a.m. at his gym.  This was according to an aerobics instructor who testified that she saw him at the gym either before or after her two aerobics classes, which ran from 9:00 to 11:30 a.m.[2]  Defendant was then seen between 12:00 p.m. and 12:30 p.m., when he stopped by the jail to check his mailbox.

Around 3:00 p.m., Krch drove the children home from school and saw defendant outside washing his truck.  Defendant asked: "Is Janet with you?"  Then he said: "Oh, no.  She wouldn't be.  That's right.  She's with her mother."  Around 4:00 p.m., defendant called Forest Lake and angrily demanded:  "Where's my wife?"  Entz explained that Janet never made it to the appointment.  About the same time, defendant called their neighbor Myres and asked whether "she had seen Janet or seen anything like cars leaving the house."  Myres responded in the negative.  Around 7:00 p.m., Entz called defendant to check on Janet.  Defendant said:  "I think she might be at her mother's.  She often goes there."  Around 8:00 p.m., defendant called Janet's parents' house, and spoke to Janet's father. Janet was not there.

/////

---

[2]  Because defendant's own timeline of events places him at home prior to and during Janet's two phone calls to Forest Lake, this would preclude him from being at the gym before 9:00 a.m.

7

Janet's mother worked as the vice principal at San Juan High School in Citrus Heights. The school's principal testified that she was present at the school on September 8, 1982. He also explained that the first few weeks of school was a "very busy time" for administrators, requiring them to work "10, 11 hours each day trying to get the kids in classes, get them registered, get schedules out, talking to parents, just making all the adjustments in the schedule that have to occur." That night, Janet's mother also had a meeting with parents regarding the school's new attendance policy.

**The Days Following Janet's Disappearance**

On September 9, 1982, defendant went to work at the jail and calmly informed Sergeant Stephen Butts that his wife was missing. He stated that there was a "minor altercation" over changing the children's school, that Janet "advised him that she was upset with her role in life," and that "she wanted to separate." In front of Butts, defendant called Janet's mother on the phone, asked if she knew where Janet was, and told Butts that she was not with her mother. Defendant then told Butts that Janet was "depressed over her plastic surgery" and that "she may have committed suicide." Despite this dire suggestion, defendant told Butts to "hold off on filing a report to see if he could locate her."

If defendant was attempting to locate his wife, he kept it a secret from friends and neighbors. Aside from the handful of inquiries recounted above, defendant neither asked whether anyone had seen Janet nor asked for help finding her. When Reynolds-Gage found out that Janet was missing, she called defendant to see if there was anything she could do to help. He responded: "I don't need anything. We've got it covered." However, despite being a trained dog handler, he never participated in the search that was conducted in the days following his wife's disappearance.

Nor did defendant show concern for his wife during this time period. He missed no days of work following Janet's disappearance and the children missed no days of school. The aerobics instructor who provided defendant with a partial alibi for the morning Janet disappeared spoke to him after learning of her disappearance and expressed her concern. Defendant responded: "Remember, I was here that day." His demeanor was "cold" and "aloof," showing "no apparent concern for his wife." Defendant's friend Kassis also described his demeanor as "nonemotional" when talking about his wife. Defendant told Kassis that Janet "just left" and mentioned that he believed her parents had something to do with her disappearance. He also said that "he would make sure [her parents] never had access to their grandkids." And six days after Janet disappeared, defendant had a document notarized that transferred custody of the children to defendant's parents in the event that an accident or injury rendered him unable to properly care for them.

**Initial Investigation**

On September 11, 1982, three days after Janet disappeared, defendant called Sergeant Butts and calmly stated that he wanted to

file a missing persons report because Janet "still hadn't returned home" and defendant "believed that she had met with an accident due to her absence."  Butts called Janet's mother, who was "upset" because her daughter was missing and she believed defendant "had done something to her."  Butts then contacted Chief Nicholas Willick and Detective Danny Boon with the Auburn Police Department and relayed the information to them.

The next day, Detective Boon interviewed Janet's mother.  As Boon described her demeanor:  "Emotionally, she was very distraught, very - by the time the interview was over, I was nearly in tears myself.  She was crying off and on.  There were times when she was angry.  It was a very, very - it was a very hard interview for her."  Janet's father was also present for the interview.  He was "somewhat quiet" but was also "nearly in tears at times."

Later in the evening, Detective Boon spoke to defendant at the jail.  In contrast to the demeanor of Janet's parents, defendant was "very calm" and "very placid."  Defendant told Boon that he believed Janet's mother might have hidden her from him.  He also told Boon that the morning Janet disappeared, they had a "discussion about their marriage" and "some of the things they discussed were divorce, property settlement, kids, and moving the kids from St. Joseph's to Forest Lake."  Defendant explained that he agreed with everything Janet brought up because "he was playing head games with her."  He also told Boon that Janet had made two phone calls to Forest Lake that morning, one at 9:00 a.m. and another at 10:00 a.m., and that he left the house to run errands after she refused his offer to drive her to Forest Lake.  Defendant further told Boon that he assumed Janet was with her mother because when he called their house the night of her disappearance, Janet's mother was not home either.

When Detective Boon asked whether defendant had noticed "anything unusual" about the condition of the house when he returned home, defendant responded that "he hadn't looked that good" and offered Boon the keys to the house to conduct a search.  Boon then performed a cursory search of defendant's house to determine whether there were any signs of a struggle and found nothing out of the ordinary.  He did find a woman's watch and a two-ring wedding set next to the sink in the master bathroom.  When he returned defendant's keys and told him about the watch and wedding set, defendant seemed surprised and said he had not seen them.

The investigation continued September 13, 1982.  Phone calls were made.  The neighborhood was canvassed.  Potential witnesses were interviewed.  Detectives determined that there was no recent bank account activity and that Janet did not show up for her college classes.  Local hotels and various modes of transportation were investigated, including rental car companies, the local taxi service, the bus depot, a private air service operating out of Auburn, and the Sacramento International Airport.  No leads were uncovered.  The media was also informed of Janet's disappearance.  The next day, detectives conducted forensic searches of defendant's house, his

cabin in Cisco Grove, and his parents' property in Lake of the Pines. His vehicles were also searched.   Nothing useful was uncovered in these searches.

On September 15, 1982, defendant was formally interviewed by Detective Boon and Inspector Johnnie Smith from the Placer County Sheriff's Department.   Defendant provided the version of events recounted above, essentially that the morning Janet disappeared, they calmly discussed divorce, property division, child custody, and transferring the children to Forest Lake, that defendant agreed with everything Janet said as a psychological game, and that he left the house to run errands after she made two phone calls to Forest Lake and refused his offer to drive her to the school.   He also provided his version of the dog-kicking incident and admitted to cheating on Janet.

Defendant further explained that the first two days Janet was missing, he believed she was with her mother.   After that, he began to suspect suicide and was "really down."   But then, he "picked up a little bit" in the hope that she "just called a friend that [he was] not aware of, ah, and ah, ah, this might be a male, and just took off."   While defendant said that he did not suspect Janet of cheating on him, he then mentioned that "she goes out shopping a lot" and stated:   "If she wanted to cheat on me, she could probably do it too and be so discreet about it, that I wouldn't know about it."   Later in the interview, defendant stated that he believed Janet had previously tried to kill herself.   He also said that he "wouldn't put it past" Janet's mother to hide her from him and their children regardless of the psychological trauma that would cause the children.

Despite the fact the interview was conducted on Janet's birthday, defendant never mentioned this to Detective Boon or Inspector Smith.   Defendant was calm through most of the interview, raising his voice towards the end when he said to Smith:   "I don't want to play careers or education against education, but I bet I have more background and more, more - other ideas on, on law enforcement than you will ever have."   And at the close of the interview, defendant said to Smith:   "I've heard a lot about you.   This is going to be an interesting challenge."   At no point during the interview did defendant become "teary eyed or choked up or show any sign of emotion."

Later in the day, Inspector Smith interviewed Janet's parents.   In contrast to defendant's demeanor, they were "very emotional and upset over the disappearance of their daughter."

The investigation continued in the following days and weeks. Extensive coordinated aerial and grid searches were conducted.   As already mentioned, defendant was never seen searching for his wife.   Throughout the investigation, Janet's mother remained in communication with Chief Willick and Detective Boon, repeatedly checking on the status of the investigation.   Defendant may have called once.   Janet's mother also expressed concern about the objectivity of the investigation because defendant was a law

enforcement officer, prompting Boon to contact several other law enforcement agencies to review the case, including the Sacramento Police and Sheriff's Departments and the California Department of Justice.

Chief Willick also contacted Detective Michael Davinroy from the Fullerton Police Department to assist in the investigation. Davinroy interviewed defendant on November 23, 1982. This interview became heated. Defendant stated that he felt "cheated" that the detectives did not talk to the aerobics instructor at the gym about his alibi until he "started bitching" about it to Inspector Smith several days after Janet disappeared. He also said that he believed Janet's mother paid her to disappear and further stated: "I think she's out there, and I think she's having a hell of a time."

In February 1983, defendant began a serious relationship with C.K. Martin, who also worked at the Placer County Jail. The relationship lasted about five months and included Martin moving into defendant's house. When they first started dating, defendant told Martin that he did not know what happened to Janet. Later in the relationship, he said that she "left with someone else." At some point, Martin told defendant that she was not comfortable sleeping on the same mattress that he slept on with Janet for so many years and suggested that he get a new mattress. Defendant responded that "he didn't need to get a new mattress; that she wouldn't be sleeping on it anymore. She wasn't coming back." During the time Martin lived at the house, defendant discouraged the children from talking about their mother in front of her. And on one occasion, when John cried about his mother's absence, defendant told him that "big boys don't cry." Martin never saw defendant show sadness over his wife's absence. Nor did she see him attempt to locate her. Defendant also prevented Janet's parents from seeing their grandchildren.

Around this time period, the Department of Justice assigned an agent, Kenneth O'Farrell, to assist in the investigation. O'Farrell conducted follow-up interviews with a number of individuals, including defendant. Defendant again claimed that Janet's mother was responsible for her disappearance, this time adding that her mother was also missing for the first two days. However, as already mentioned, the morning after Janet disappeared, defendant called Janet's mother on the phone in front of Sergeant Butts, who testified that defendant asked if she knew where Janet was, and then said that Janet was not with her. When defendant remembered this during the interview, he revised his claim that Janet's mother was missing for two days, but maintained that she was not home when he called their house the night of Janet's disappearance. Defendant also repeated his claim that Janet's mother had offered to pay her to leave him.

By the middle of 1983, the investigation was still ongoing, but was no longer investigated on a day-to-day basis. Janet's mother continued to call seeking information on the case. Eventually, all of the leads dried up, and the investigation was terminated. When Agent O'Farrell informed Janet's mother that they were ending the

investigation, she "started sobbing uncontrollably" and "begged [him] not to shut the investigation down."

**Discovery of the Skull at Rollins Lake**

In 1995, the cranial portion of Janet's skull was found near Rollins Lake, about 18 miles north of Auburn, protruding from the mud at the bottom of a recently-drained pond. The cranium, which was not determined to be Janet's until 2007, had an unnatural hole measuring .65 of an inch in diameter. According to the testimony of two forensic anthropologists, the hole in Janet's skull was inflicted at or about the time of death and was consistent with a gunshot wound from a large caliber handgun.

Defendant's field training with the Sheriff's Department made him familiar with the roads and area surrounding Rollins Lake. He was issued a Smith and Wesson .357–Magnum revolver as part of his service equipment.

People v. Kovacich, 201 Cal.App.4th 863, 867-879 (2011).[3]

/////

---

[3]   In his traverse, petitioner challenges much of the factual background set forth in the California Court of Appeal's opinion affirming his conviction. Petitioner points to trial testimony and police interview responses in an attempt to contradict some of the facts related by the Court of Appeal. He also expresses his disagreement with some of the trial testimony and argues that it was not based on sufficient information. Petitioner points to other trial testimony which reflects more favorably on him and his relationship with Janet Kovacich (Janet) than the facts contained in the state appellate court's opinion. Petitioner informs this court about additional facts in order to attempt to explain, to his advantage, some of the facts contained in the state court's opinion and/or to suggest alternative reasons for Janet's disappearance. Petitioner also blames chief police investigator Jerry Johnson for some of these alleged factual inaccuracies, arguing that Johnson coached witnesses and fabricated reports. (See ECF No. 30 at 1-44.) A number of petitioner's challenges to the facts set forth in the California Court of Appeal's opinion are contained in his habeas claims, which are discussed below. Under the AEDPA, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). See also Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004); 28 U.S.C. § 2254(e)(1). Pursuant to 28 U.S.C. § 2254(e)(1), a habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." This court has reviewed all of the factual "corrections" petitioner seeks in his traverse. The undersigned concludes that the decision of the California Court of Appeal affirming petitioner's judgment of conviction was not based on an unreasonable determination of the facts of this case in light of the evidence presented at trial. In addition, petitioner has failed to show by clear and convincing evidence that any of the material facts set forth in the opinion of the California Court of Appeal affirming his conviction are objectively unreasonable.

1    After the California Court of Appeal affirmed his judgment of conviction, petitioner filed

2    a petition for review in the California Supreme Court.  (Resp't's Lod. Doc. 41.)  Therein, he

3    challenged the Court of Appeal's rulings with regard to the admission of evidence regarding the

4    dog kicking incident as well as the admission of expert witness testimony regarding the behavior

5    and reactions of victims of domestic violence.  The Supreme Court summarily denied that petition

6    for review by order dated March 14, 2012.  (Resp't's Lod. Doc. 42.)  Petitioner subsequently filed

7    a petition for writ of habeas corpus in the California Supreme Court.  (Resp't's Lod. Doc. 43.)

8    That petition was summarily denied by order dated September 24, 2014.  (Id.)

9    Petitioner filed his federal habeas petition in this court on May 20, 2013.

10   **II.  Standards of Review Applicable to Habeas Corpus Claims**

11   An application for a writ of habeas corpus by a person in custody under a judgment of a

12   state court can be granted only for violations of the Constitution or laws of the United States.  28

13   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

14   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

15   U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

16   Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

17   corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

25   For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

26   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

27   Greene v. Fisher, ___ U.S. ___, ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852,

28   859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court

1  precedent "may be persuasive in determining what law is clearly established and whether a state

2  court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606

3  F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen

4  a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme]

5  Court has not announced." Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013)

6  (citing Parker v. Matthews, ___ U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be

7  used to "determine whether a particular rule of law is so widely accepted among the Federal

8  Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further,

9  where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is

10  "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77

11  (2006).

12       A state court decision is "contrary to" clearly established federal law if it applies a rule

13  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

14  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

15  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

16  writ if the state court identifies the correct governing legal principle from the Supreme Court's

17  decisions, but unreasonably applies that principle to the facts of the prisoner's case.   Lockyer v.

18  Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

19  (9th Cir. 2004).  A federal habeas court "may not issue the writ simply because that court

20  concludes in its independent judgment that the relevant state-court decision applied clearly

21  established federal law erroneously or incorrectly.  Rather, that application must also be

22  unreasonable." Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

23  (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

24  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

25  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

26  'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

27  Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

28  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

1   must show that the state court's ruling on the claim being presented in federal court was so

2   lacking in justification that there was an error well understood and comprehended in existing law

3   beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

4          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

5   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

6   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

7   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

8   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

9   de novo the constitutional issues raised.").

10         The court looks to the last reasoned state court decision as the basis for the state court

11  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

12  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

13  previous state court decision, this court may consider both decisions to ascertain the reasoning of

14  the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

15  federal claim has been presented to a state court and the state court has denied relief, it may be

16  presumed that the state court adjudicated the claim on the merits in the absence of any indication

17  or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

18  may be overcome by a showing "there is reason to think some other explanation for the state

19  court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

20  (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims but

21  does not expressly address a federal claim, a federal habeas court must presume, subject to

22  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

23  ___, 133 S. Ct. 1088, 1091 (2013).

24         Where the state court reaches a decision on the merits but provides no reasoning to

25  support its conclusion, a federal habeas court independently reviews the record to determine

26  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

27  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

28  review of the constitutional issue, but rather, the only method by which we can determine whether

15

1   a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

2   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

3   reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

4         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

5   Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze

6   just what the state court did when it issued a summary denial, the federal court must review the

7   state court record to determine whether there was any "reasonable basis for the state court to deny

8   relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could

9   have supported, the state court's decision; and then it must ask whether it is possible fairminded

10  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

11  decision of [the Supreme] Court." 562 U.S. at 102. The petitioner bears "the burden to

12  demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v.

13  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

14        When it is clear, however, that a state court has not reached the merits of a petitioner's

15  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

16  habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

17  F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

18  **III. Petitioner's Claims**

19        **A. Insufficient Evidence**

20        In his first ground for federal habeas relief, petitioner claims that the evidence introduced

21  at his trial was insufficient to support the imposition of the sentencing enhancement against him

22  for use of a firearm because there was inadequate proof that Janet died from a gunshot wound.

23  (ECF No. 1 at 5-6.)[4] In a related argument, petitioner contends that the lack of proof supporting

24  the firearm use enhancement also "eliminates the murder conviction." (Id.) Petitioner notes that

25  two expert witnesses called by the defense testified that it was impossible to conclude whether the

26

27  [4]  Citations to the habeas petition in these findings and recommendations are to the page numbers
     assigned by petitioner in his petition and not to the page numbers contained on the court's
28  CM/ECF system.

16

fracture on the skull remnant found at Rollins Lake was caused by a bullet or by something else

that occurred either before or after Janet's death.  (Id.)

### 1. State Court Decision

The California Court of Appeal rejected this insufficient evidence claim by petitioner as

well as the arguments upon which it was based.  The state appellate court reasoned as follows:

> Defendant contends that we must reverse the firearm enhancement because the evidence was insufficient to establish beyond a reasonable doubt that Janet's death was caused by a firearm.  He further asserts that, because of this, the evidence was also insufficient to support his murder conviction.  We disagree.
>
> "'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]"  (People v. Wallace (2008) 44 Cal.4th 1032, 1077, 81 Cal. Rptr.3d 651, 189 P.3d 911; Jackson v. Virginia (1979) 443 U.S. 307, 317–320, 99 S. Ct. 2781, 61 L.Ed.2d 560, 572–574.)  The standard of review is the same in cases in which the prosecution relies on circumstantial evidence.  (People v. Snow (2003) 30 Cal.4th 43, 66, 132 Cal. Rptr.2d 271, 65 P.3d 749.)  "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'"  (People v. Stanley (1995) 10 Cal.4th 764, 792–793, 42 Cal. Rptr.2d 543, 897 P.2d 481.)  Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding.  (People v. Thomas (1992) 2 Cal.4th 489, 514, 7 Cal. Rptr.2d 199, 828 P.2d 101; People v. Rodriguez (1999) 20 Cal.4th 1, 11, 82 Cal. Rptr.2d 413, 971 P.2d 618.)
>
> Because defendant's attack on the sufficiency of the evidence is focused on the forensic evidence, we begin by discussing that evidence.
>
> Dr. Steven Symes, professor of forensic anthropology at Mercyhurst College in Erie, Pennsylvania, testified that the hole in the cranium recovered from Rollins Lake was consistent with a gunshot wound from a large caliber handgun.  He explained that there is a difference between ballistic (high velocity) and blunt force (low velocity) trauma, and that bone responds differently to the two forms of impact.  With a blunt force impact, the bone will bend and fail in plastic deformation, essentially caving in.  With a ballistic impact, the higher velocity causes the bone to act more like glass, creating a "plug and spall"; the outside of the bone will have

17

a fairly uniform hole where the bone is punched through, causing a shock wave that creates a cone-shaped bevel on the inside of the bone.

Dr. Symes explained that the hole in Janet's cranium exhibited the characteristics of a ballistic impact, particularly the beveling of the bone, a radiating fracture extending from the hole to a natural cranial suture, and the separation of the suture as the energy from the impact traveled along the fracture line and through the suture. The presence of a radiopaque particle embedded in the petrous portion of the temporal bone also contributed to Dr. Symes's conclusion that the hole was caused by a ballistic impact.  The size of the hole, coupled with the fact that the radiating fracture followed some of the middle meningeal arteries that extend along the inside of the skull, but then turned away from these arteries, indicated to Dr. Symes that the hole was likely caused by a large caliber lower velocity handgun as opposed to a higher velocity weapon.

Dr. Patrick Willey, professor of forensic anthropology at Chico State University, also testified that the hole in the Rollins Lake cranium was consistent with a gunshot wound.  This conclusion was also based on the beveling of the bone, the radiating fracture, and the radiopaque particle embedded in the bone.

Defendant argues that we must reverse the firearm enhancement because this forensic evidence "clearly was consistent with two reasonable conclusions:  that the defect was attributable to a gunshot and that it was due to an agency other than a firearm."  He posits that since the cranium had been in the mud near Rollins Lake for many years, and since Rollins Lake is a well-frequented camping ground, "it certainly was very possible that Janet's skull, which indisputably had been broken in pieces by taphonomic forces, had been struck by some sharp digging instrument during that time."  We are not persuaded.

While, as defendant points out, Dr. Willey admitted to having never seen a pickax injury, he also explained that "if it were a pickax, it's going to have some of the properties of blunt force, so instead of that beveling and radiating fractures, I think it's going to be a penetrating wound . . . . [¶]  And my bet would be that it's going to show some of the properties we typically associate with blunt force, kind of the caving in of the wound, and we don't get that with the Rollins Lake [cranium]."  Dr. Symes, who had seen pickax injuries in his career, confirmed that a pickax causes blunt force trauma:  "It may have a sharp end on it.  It could be sharp, but it turns into blunt trauma and is a penetrating wound.  It could be [the] size of a bullet hole, but we know it is [moving more slowly], so you're going to see reduced energy."  While a pickax could create a round hole and radiating fracture, because the tool expands, it typically creates "microfractures around the entrance where it is crushing more."  And because of the reduced energy, a pickax injury would not create pressure in the skull, and therefore would not create beveling on the inside of the bone and separation of the natural sutures.

Drs. Willey and Symes also testified that the hole in Janet's cranium was sustained at or about the time of death, and was inconsistent with an injury occurring long after death, because the beveling and radiating fracture would have required the bone to possess a certain amount of elasticity.  Thus, defendant's theory that Janet's cranium could have been struck by a camper's pickax following her death would require that camper to have struck the cranium with the sharp point of the pickax with enough velocity to cause ballistic trauma, while pulling the instrument back before the expanded portion of the pickax could crush the edges of the hole.  Because this injury was inflicted close to the time of death, this camper either did not notice striking a decomposing corpse with his pickax or chose not to call the police to report that he had found and accidentally mutilated a dead body.    While Dr. Willey acknowledged that "almost anything is possible," the jury was more than justified in concluding that this possibility was not reasonable.

Nor are we persuaded by defendant's reliance on People v. Allen (1985) 165 Cal. App.3d 616, 211 Cal. Rptr. 837 (Allen).  There, two defendants, Allen and Brewer, entered Ainsworth's house for the purpose of executing him and eliminating any witnesses to that execution.    Two such witnesses, Ainsworth's wife and cousin, survived the encounter.    Based on their testimony, Allen and Brewer entered the kitchen with Ainsworth.  Two shots were fired.  Allen then entered the bedroom and shot the wife once.  Brewer shot her several more times after she crawled into the closet to hide.  Allen fired a final shot at the cousin, who was hiding behind the couch;  this shot missed, and both defendants left the house.  Ainsworth died of two gunshot wounds to the head and chest.  (Id. at pp. 621–622, 211 Cal. Rptr. 837.)   Allen and Brewer were convicted of the first degree murder of Ainsworth and the attempted murders of the wife and cousin; each was found to have personally used a firearm during the commission of the crimes.  (Id. at pp. 620–621, 211 Cal. Rptr. 837.)

The  Court  of  Appeal  reversed  the  personal-use  firearm enhancement with respect to the murder count:  "Since two .32 caliber cartridges were found on the kitchen floor, the evidence suggested that both of [Ainsworth's] wounds were inflicted by the same gun.  Whether that gun was used by Allen, as opposed to Brewer, is purely a matter of conjecture.  The state had the burden of establishing Allen's personal use beyond a reasonable doubt.  [Citation.]  Since the evidence of what happened in the kitchen proved at most a 50 percent probability that he was the user, the state's burden was not met: 'We … have a case belonging to that class of cases where proven facts give[ ] equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other . . . .  [Citation.]'"  (Allen, supra, 165 Cal. App.3d at p. 626, 211 Cal. Rptr. 837, citing Pennsylvania R. Co. v. Chamberlain (1933) 288 U.S. 333, 339, 53 S. Ct. 391, 77 L.Ed. 819, 823.)

/////

Defendant misconstrues Allen, supra, 165 Cal. App.3d 616, 211 Cal. Rptr. 837, to hold that the People must eliminate the "possibility" that someone other than defendant is the shooter in order for a personal-use firearm enhancement to stand.  He then argues that because the forensic anthropologists in this case could not "absolutely eliminate" every other potential cause of the hole in Janet's cranium, the People did not eliminate the possibility that she died from something other than a firearm.  Because of this, argues defendant, we must reverse.  This argument fails for two reasons. First, Allen does not require the People to eliminate the possibility that someone other than defendant was the shooter or that the deceased's death was caused by something other than a firearm. The case merely holds that where the facts supporting two inconsistent inferences stand in equipoise, judgment must go against the party with whom the burden of sustaining one of the inferences resides.

Second, what an anthropologist can conclude from a forensic examination of bone is more limited than what a reasonable jury may find beyond a reasonable doubt after considering the evidence as a whole.  (See People v. Thomas (1992) 2 Cal.4th 489, 515, 7 Cal. Rptr.2d 199, 828 P.2d 101.)  The fact that Janet vanished about an hour before she was scheduled to appear at Forest Lake, left behind her children and personal belongings, never contacted her friends and family, never withdrew any money from her back account, and failed to show up for her college courses, all create a reasonable inference that she was killed the morning she disappeared.  (See People v. Ruiz (1988) 44 Cal.3d 589, 610–611, 244 Cal. Rptr. 200, 749 P.2d 854; People v. Johnson (1991) 233 Cal. App.3d 425, 442, 284 Cal. Rptr. 579.)  The prosecution also provided the jury with substantial evidence indicating that Janet was not suicidal and would not have abandoned her children. Instead, she was looking forward to getting herself and her children away from defendant, going back to school, and "making something important of herself."

Defendant's relationship with Janet was filled with antagonism and enmity, including verbal and physical abuse and two prior separations.  He was alone with her the morning she disappeared, and by his own admission, they had a "minor altercation" after Janet told him she was leaving.  This was highly probative of defendant's motive to kill her, and thus his identity as the killer. (See People v. Cartier (1960) 54 Cal.2d 300, 311, 5 Cal. Rptr. 573, 353 P.2d 53; People v. De Moss (1935) 4 Cal.2d 469, 473, 50 P.2d 1031.)  Defendant also admitted to cheating on Janet before her disappearance, which was also probative of motive to kill.  (See People v. Gosden (1936) 6 Cal.2d 14, 25, 56 P.2d 211; People v. Houston (2005) 130 Cal. App.4th 279, 307, 29 Cal. Rptr.3d 818.)

From the testimony of Drs. Symes and Willey, the jury could reasonably have concluded that Janet died from a gunshot wound to the head from a large caliber handgun.  Defendant happened to possess such a handgun.  He also admitted to offering to give Janet a ride to Forest Lake the morning she disappeared, stating that he nonchalantly agreed with everything she said in order to play "head

games" with her.  Based on these statements, and the history of abuse in the marriage, the jury was justified in concluding that defendant's mild reaction to the news of her imminent departure was not genuine.  And based on Janet's second phone call to Forest Lake, in which she confirmed that she had secured a ride and scheduled an appointment for 11:10 a.m., the jury could reasonably have concluded that she accepted defendant's offer to drive her to the school.  Indeed, Janet's surgery precluded her from driving herself, her mother was at San Juan High School all day, and she asked no one else for a ride.

Defendant's location was not confirmed by a witness until after 11:30 a.m., which gave him plenty of time to drive Janet to Rollins Lake, an area he was familiar with, shoot her in the head with a large caliber handgun, which he had access to, and return to Auburn to make an appearance at the gym.  Thus, defendant not only had a strong motive to kill Janet, but also had the opportunity to have done so.  Defendant's demeanor and actions following Janet's disappearance also were consistent with the jury's conclusion that he killed her.  He was "cold" and "aloof."  He did not bother to look for her despite his training as a dog handler.  He began a serious relationship within months of her disappearance and told his new girlfriend that Janet "wasn't coming back."
Based on all of the circumstantial evidence in this case, the jury could have concluded beyond a reasonable doubt that defendant murdered his wife, and that he did so by use of a firearm.

Kovacich, 201 Cal. App.4th at 879-884.

## 2. Applicable Legal Standards

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326.  See also Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n. 13 (9th Cir.2005).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

1  of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Cavazos</u>

2  <u>v. Smith</u>, ___ U.S. ___, ___, 132 S. Ct. 2, 4 (2011).

3  In conducting federal habeas review of a claim of insufficiency of the evidence, "all

4  evidence must be considered in the light most favorable to the prosecution." <u>Ngo v. Giurbino</u>,

5  651 F.3d 1112, 1115 (9th Cir. 2011).  "<u>Jackson</u> leaves juries broad discretion in deciding what

6  inferences to draw from the evidence presented at trial," and it requires only that they draw

7  "'reasonable inferences from basic facts to ultimate facts.'" <u>Coleman v. Johnson</u>, ___ U.S. ___,

8  ___, 132 S. Ct. 2060, 2064 (2012) (citation omitted).  "'Circumstantial evidence and inferences

9  drawn from it may be sufficient to sustain a conviction.'" <u>Walters v. Maass</u>, 45 F.3d 1355, 1358

10  (9th Cir. 1995) (citation omitted).[5]

11  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

12  the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

13  <u>Juan H.</u>, 408 F.3d at 1274.  In order to grant relief, the federal habeas court must find that the

14  decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively

15  unreasonable application of the decisions in <u>Jackson</u> and <u>Winship</u> to the facts of the case.  <u>Ngo</u>,

16  651 F.3d at 1115; <u>Juan H.</u>, 408 F.3d at 1275 & n.13.  Thus, when a federal habeas court assesses a

17  sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double

18  dose of deference that can rarely be surmounted." <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir.

19  2011).  <u>See also</u> <u>Kyzar v. Ryan</u>, 780 F.3d 940, 948-49 (9th Cir. 2015) (same); <u>Long v. Johnson</u>,

20  736 F.3d 891, 896 (9th Cir. 2013) (same).

21  **3. Analysis**

22  The decision of the California Court of Appeal that the evidence introduced at petitioner's

23  trial was sufficient to support imposition of the gun use sentencing enhancement, and therefore

24  petitioner's murder conviction, was not contrary to or an unreasonable application of the

25  decisions in <u>Jackson</u> and <u>In re Winship</u> to the facts of this case.  <u>Smith</u>, 132 S. Ct. at 4.  Viewing

26  

27  [5]  The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>,

28  373 F.3d at 983.

the evidence admitted at petitioner's trial as a whole and in the light most favorable to the prosecution, a rational juror could have found beyond a reasonable doubt that petitioner killed his wife with a handgun.  This is true even though the evidence introduced at petitioner's trial could also have supported a jury finding that the hole in Janet's skull was caused by something other than a bullet.  Notwithstanding the defense evidence suggesting a different possible explanation, for the reasons expressed by the California Court of Appeal there was sufficient evidence to support the jury's verdict in this case.  Here, the jury decided what inferences to draw from the evidence presented at trial and petitioner has not met his heavy burden of establishing that no rational trier of fact could have agreed with the jury's finding in this case.  Accordingly, petitioner is not entitled to federal habeas relief on his claim of insufficiency of the evidence.

### B. Trial Court's Erroneous Admission of Evidence

Petitioner raises two claims challenging the trial court's evidentiary rulings at his trial. The court will address these two claims in turn below.

### 1. Dog Kicking Incident

Petitioner claims that the trial court committed "reversible error" in admitting "extensive disputed tainted" evidence, including Janet's statements about the dog kicking incident.  (ECF No. 1 at 8.)  He argues there was no evidence introduced at his trial that he ever abused his own or any other police dog.  (Id.)[6]

The California Court of Appeal set forth the background to this claim as follows:

> The People presented evidence relating to the dog-kicking incident in several forms: (1) Janet's statements that defendant had kicked the dog to death, which were not offered for their truth, but rather as circumstantial evidence of her state of mind; (2) defendant's statements to detectives in which he admitted to kicking the dog as a form of discipline, but denied causing the animal's death; (3)

---

[6]  Petitioner also argues that a "media blitz" about Janet's murder and the killing of the family dog was spearheaded by Jerry Johnson, a reserve officer for the Auburn Police Department, who had a "limited and biased investigative mentality."  (Id. at 9.)  Petitioner provides numerous examples of events and trial testimony that he believes demonstrate Officer Johnson's bias against him and the improper nature of the police investigation into Janet's disappearance.  (Id. at 9-13.)  Petitioner's complaints about Officer Johnson, which run throughout his petition, will be addressed later in these findings and recommendations in connection with several of petitioner's other habeas claims.

testimony from the veterinarian, Dr. Jan Hershenhouse, in which she described the dog's death, stated that she saw no signs of external trauma, but also stated that an autopsy had not been performed and that she could not rule out that the animal died from being kicked; and (4) testimony from Dr. Symes in which he explained that he had examined the dog's bones in 2005 and found no indication of blunt force trauma, but because the bones had deteriorated significantly while in the ground, he could not express an opinion as to the cause of death.[7]

Defendant moved in limine to exclude all reference to Janet's claim that defendant was responsible for the death of the family dog. He argued that her statements regarding the matter were "not trustworthy" and "appear[ed] to be a way by the prosecution to introduce proscribed character evidence barred under [section] 1101." He also asked the trial court to exclude the portions of his statements to police in which he admitted to kicking the dog.

The trial court denied the motion, explaining that Janet's statements that she feared defendant because she witnessed him violently assault the dog would be admitted pursuant to section 1250 and as circumstantial evidence of her state of mind. The trial court found her statements to be trustworthy because defendant admitted to kicking the dog. While defendant also denied causing the dog's death, the trial court explained: "Whether the defendant actually killed the dog is not relevant in the court[']s view. What is relevant is how [Janet] would have reacted to witnessing the assault and whether it was the catalyst for her to decide to leave her husband on the morning of September 8th." The trial court also found the evidence to be admissible under section 352 because "defendant's assault on the dog was relatively close in time to [Janet's] disappearance and thus highly probative of her fear and decision to terminate the relationship. Thus, the probative value is not substantially outweighed by the risk [of] undue prejudice to the defendant."

Kovacich, 201 Cal. App.4th at 890-891.

/////

---

[7]   Defendant also presented evidence relating to the dog-kicking incident. He elicited testimony from defense expert and veterinary pathologist, Dr. William Spangler, in which the doctor stated that he did not believe the dog died from acute trauma, and that multiple fractures in the dog's bones were likely caused by the weight of the soil on the animal's body after it was buried. He also elicited testimony from Detective Boon, in which the detective explained that he was told by another officer that Kristi had said that defendant kicked the dog like a soccer ball and threw the animal around. Finally, he elicited testimony from Kristi, in which she denied observing her father abuse the dog and also stated that she did not remember telling the investigating officers anything about his treatment of the animal. Of course, defendant cannot complain that testimony he elicited was admitted into evidence. (People v. Williams (2009) 170 Cal. App.4th 587, 620, 88 Cal. Rptr.3d 401 [challenged testimony was elicited by defendant's counsel; "any error was invited, and defendant may not challenge that error on appeal"].)

24

1    The California Court of Appeal concluded that Janet's statements about the dog kicking

2    incident were properly admitted under California law as circumstantial evidence of her state of

3    mind. Id. at 891. The court also agreed with the trial court that Janet's statements were properly

4    admitted under Cal. Evidence Code § 352. Id. at 892. The court reasoned that Janet's statements

5    were "highly probative of her fear of defendant, both for herself and for her children, shortly

6    before she disappeared," and that the probative value of the evidence was not outweighed by its

7    prejudicial effect because "it was not unreasonable for the trial court to conclude that the jury

8    would be able to use the statement solely as evidence of Janet's state of mind." Id. The state

9    appellate court also concluded that petitioner's own statements about kicking the dog were

10   admissible under the California hearsay rules and did not constitute improper character evidence.

11   Id. at 892-93.

12       The court reasoned as follows:

13           The trial court properly admitted Janet's statements concerning
             defendant's assault on the dog as circumstantial evidence of her
14           state of mind. While several such statements were admitted, for our
             purposes one example will suffice. After the dog-kicking incident,
15           Janet called her brother Gary in tears, told him that defendant had
             kicked the dog to death, and explained that "she was starting to feel
16           threatened at home, and she was worried for her safety, and she was
             worried for Kristi and John."
17
             As we have explained, the portion of the statement in which Janet
18           expressed concern for her safety and for that of her children was
             admissible hearsay under section 1250 because her mental state was
19           at issue in this case. The portion of the statement in which she
             claimed that defendant had kicked the dog to death was not offered
20           for its truth, i.e., that defendant had in fact kicked the dog to death,
             but rather as circumstantial evidence of her state of mind. Whether
21           true or not, the fact that the statement was made was relevant to
             Janet's mental state. (Ortiz, supra, 38 Cal. App.4th at p. 389, 44
22           Cal. Rptr.2d 914.) The jury was properly admonished that the
             statement was not received for the truth of the matter stated and
23           could be used only as evidence of her state of mind.

24           Nor did the trial court abuse its discretion in concluding that the
             evidence was admissible under section 352. This statement, unlike
25           the general statements that Janet feared "what might happen" if she
             left defendant or went against his wishes, does assert personal
26           knowledge of a past act of the defendant. "In this situation, it is
             more difficult to fashion, and more demanding to expect the jury
27           will follow, a limiting instruction. The jury can only legitimately
             conclude the declarant feared [defendant] if the statement is
28           truthful. However, the jury would have been instructed not to

25

consider the statement itself as true, because it is not admitted for its truth, but only as circumstantial evidence of state of mind. The difficulty is compounded the more inflammatory the prior conduct." (Ortiz, supra, 38 Cal. App.4th at p. 390, 44 Cal. Rptr.2d 914.) If the trial court concludes that the jury will be unable to follow such an instruction, it should exercise its discretion and exclude the evidence under section 352. (Id. at p. 392, 44 Cal.Rptr.2d 914.)

Here, as the trial court correctly observed, Janet's statement that defendant kicked the dog to death is highly probative of her fear of defendant, both for herself and for her children, shortly before she disappeared. As already mentioned, such a fear is inconsistent with defendant's theory that she simply abandoned him and the children. While the prior conduct was fairly inflammatory, it was not unreasonable for the trial court to conclude that the jury would be able to use the statement solely as evidence of Janet's state of mind. The jury would have understood that the entire statement was not based on personal knowledge because the veterinarian did not even know whether the dog died from being kicked. The only portion of the statement based on her personal knowledge was the claim that defendant kicked the dog. But defendant admitted to kicking the dog. The jury could reasonably have used defendant's admission for its truth, and limited its use of Janet's statement to prove her state of mind. Thus, as was the case in Ortiz, "[t]he statements were made under circumstances indicating their trustworthiness. While obviously prejudicial to [defendant] (in the sense contemplated by section 352), this evidence was also highly probative of her attitude toward him. On balance, we cannot say the trial court abused its discretion in allowing these statements into evidence." (Ortiz, supra, 38 Cal. App.4th at p. 394, 44 Cal. Rptr.2d 914.)

**Defendant's Admissions**

The trial court also properly admitted defendant's statements to detectives, in which he admitted to kicking the dog, but denied causing the animal's death. Evidence of a statement made by a defendant in a criminal action is not made inadmissible by the hearsay rule when offered against that defendant, and may therefore be admitted for the truth of the matter asserted in the statement. (§ 1220; People v. Smith (1984) 151 Cal. App.3d 89, 96, 198 Cal. Rptr. 623.) Nevertheless, defendant argues admission of evidence of the dog-kicking incident violates section 1101 because it amounts to evidence of his violent character offered to prove that he acted in conformity with that character in killing Janet. We disagree.

Section 1101, subdivision (a), generally provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, subdivision (b) of that section provides that a specific instance of a person's conduct is admissible "when relevant to prove some fact (such as motive, . . . intent, . . . identity, . . . ) other than his or her

disposition to commit such an act."  (§ 1101, subd. (b).)

"Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors."  (People v. Zack (1986) 184 Cal. App.3d 409, 415, 229 Cal. Rptr. 317; People v. Linkenauger (1995) 32 Cal. App.4th 1603, 1612, 38 Cal. Rptr.2d 868.)  This is because evidence showing "quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense.  [Citations.]  Likewise, evidence of threats of violence by an accused against the victim of an offense of violence is proof of the identity of the offender."  (People v. Daniels (1971) 16 Cal. App.3d 36, 46, 93 Cal. Rptr. 628; People v. Shaver (1936) 7 Cal.2d 586, 592, 61 P.2d 1170; People v. De Moss, supra, 4 Cal.2d 469, 473, 50 P.2d 1031.)

Thus, the trial court properly admitted evidence of prior incidents of domestic violence perpetrated by defendant against Janet.  But the question remains as to whether evidence of the incident in which defendant violently kicked the family dog amounts to an act of abuse against Janet, such that it falls within the above-cited rule.  If it does, then it is admissible not only under section 1101 to prove his motive, but also under section 1109 to prove his propensity to commit the murder.  For the following reasons, we hold that it does.

Section 1109, subdivision (a)(1), provides:  "Except as provided in subdivision (e)[8] or (f)[9], in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  Subdivision (d)(3) of this section provides:  "'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code.  Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."  (§ 1109, subd. (d)(3).)

Penal Code section 13700, subdivision (b), defines "domestic violence" to mean "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has

---

[8]   Subdivision (e) provides:  "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

[9]   Subdivision (f) provides:  "Evidence of the findings and determinations of administrative agencies regulating the conduct of health facilities licensed under Section 1250 of the Health and Safety Code is inadmissible under this section."

had a dating or engagement relationship." Subdivision (a) of this provision defines "abuse" to mean "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

Family Code section 6211 expands the definition of "domestic violence" to include abuse committed against a "child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected," and "[a]ny other person related by consanguinity or affinity within the second degree." Family Code section 6203 expands the definition of "abuse" to include "engag[ing] in any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320." And Family Code section 6320 authorizes the court to issue a protective order regarding "any animal owned, possessed, leased, kept, or held by either the petitioner or the respondent or a minor child residing in the residence or household of either the petitioner or the respondent," and further authorizes the court to enjoin the respondent from "molesting, attacking, striking, threatening, harming, or otherwise disposing of the animal."

In People v. Ogle (2010) 185 Cal. App.4th 1138, 110 Cal. Rptr.3d 913, the Court of Appeal held stalking to be an act of domestic violence within the meaning of section 1109, and therefore admissible to prove propensity to commit the crime of making criminal threats. (Id. at p. 1140, 110 Cal. Rptr.3d 913.) The court explained that "[s]ection 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition," and further explained: "Family Code section 6211 defines domestic violence to require abuse and Family Code section 6203 defines 'abuse' to include 'engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320.' Family Code section 6320 authorizes the court to enjoin a party from 'stalking, threatening, . . . harassing, [and] telephoning,' the other party. Thus, stalking a former spouse is domestic violence for purposes of section 1109 as defined by Family Code section 6211." (Id. at p. 1144, 110 Cal. Rptr.3d 913, citing People v. Dallas (2008) 165 Cal. App.4th 940, 952, 81 Cal. Rptr.3d 521.)

Similarly, in People v. Brown (2001) 96 Cal. App.4th Supp. 1, 117 Cal. Rptr.2d 738, the Court of Appeal held that vandalism was an act of domestic violence under the Family Code where the defendant smashed most of the windows in his wife's car after an argument while the wife walked away from the vehicle. (Id. at pp. 39–40, 117 Cal.Rptr.2d 738.) This was because "Family Code section 6203 defines 'abuse' in relevant part as '[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320.' [Citation.] Family Code section 6320 provides in relevant part that '[t]he court may issue an ex parte order enjoining a party from molesting, attacking, striking, . . . destroying personal property . . . of the other party. . . .' [Citation.]" (Id. at p. 39, fn. 6,

117 Cal. Rptr.2d 738.)  The court also rejected the defendant's argument that his wife was not the victim of the vandalism, explaining that such a position was "inconsistent with commonsense, as well as the language and purpose of the relevant statutes." (Id. at p. 39, 117 Cal. Rptr.2d 738.)

In this case, defendant told Detective Boon and Inspector Smith that he "went overboard" kicking the dog and "shouldn't have gone that far."  He told them that he kicked the animal as a form of discipline after the dog got into some garbage, that he did not believe the dog died from the beating, and that Janet did not see anything that she had not seen on numerous prior occasions.  He confirmed to Detective Davinroy that he "often" kicked the dog.  He told Agent O'Farrell that the children were also present when he kicked the dog, and that seeing him kick the animal was not "out of the ordinary."

As already mentioned, Family Code section 6320 authorizes the court to issue a protective order regarding "any animal owned, possessed, leased, kept, or held by either the petitioner or the respondent or a minor child residing in the residence or household of either the petitioner or the respondent," and further authorizes the court to enjoin the respondent from "molesting, attacking, striking, threatening, harming, or otherwise disposing of the animal."  Thus, defendant's assault on the family dog amounted to "abuse" within the meaning of Family Code section 6203.  This abuse was committed against his wife and children, who witnessed the violent assault, and amounted to "domestic violence" within the meaning of Family Code section 6211.  Indeed, as domestic violence expert Marjorie Cusick testified, in an abusive relationship - which independent evidence established defendant and Janet's relationship to be - harming an animal is "a very high-level threat to the victim as to the ability of the perpetrator to not only threaten to do something incredibly harmful but to actually act it out in front of them."  Defendant's statements regarding his assault on the family dog were admissible under section 1101 to prove his motive, and under section 1109 to prove his propensity to commit the murder.

Nor were the statements rendered inadmissible by section 352.  "In a case where the identity of a person who commits a crime is attempted to be proven by circumstantial evidence, such as in the case at bar, evidence of a motive on the part of a defendant charged is always a subject of proof, and the fact of motive particularly material."  (People v. Argentos (1909) 156 Cal. 720, 726, 106 P. 65; People v. Daniels, supra, 16 Cal. App.3d at p. 46, 93 Cal. Rptr. 628.)  Evidence of prior acts of domestic violence against Janet, including defendant's statements regarding his assault on the dog, was highly probative of motive and identity.  The trial court did not abuse its discretion in allowing these statements into evidence.

Kovacich, 201 Cal. App.4th at 891-896.

/////

/////

29

## 2. Expert Opinion on Domestic Violence

In his third ground for relief, petitioner claims that the trial court erred in admitting the prosecution's expert testimony on domestic violence.  He also claims that the prosecutor committed misconduct in "violating the court's order limiting that testimony."  (ECF No. 1 at 14.)

The California Court of Appeal rejected this argument, reasoning, in pertinent part, as follows:

> We also reject defendant's assertion that the trial court erred by allowing expert testimony from domestic violence expert Marjorie Cusick.  And while Cusick's testimony did exceed the limitations imposed by the trial court, we find no prosecutorial misconduct.
>
> **Background**
>
> Defendant moved in limine to exclude Cusick's testimony, which the People argued was "relevant and probative to explain to the jury why Janet would choose to stay with the defendant for as long as she did despite physical and verbal abuse on several prior occasions, as well as why she did not immediately report the domestic violence to the police."  The trial court denied the motion, allowing the testimony with the following restriction:  "The witness may not, however, express any opinion about the particular facts of this case or give her opinion regarding the state of mind of either the defendant or his wife."
>
> During trial, the People provided an additional offer of proof regarding Cusick's testimony, arguing that the testimony was needed to disabuse the jury of the common misconception that it is easy for a battered spouse to leave an abusive marriage.  This testimony was crucial because there was evidence that Janet expressed her fear of defendant as early as 1979, and "the core misconception that the jury might have is that people who are fearful will just leave, so if she was so fearful in 1979, why didn't she just leave?  If she was so fearful on August 22, 1982, why didn't she just leave then?  Why did she continue to live in that house?"  The prosecutor also pointed out that the defense had called into question Janet's credibility with respect to her statements of fear by asking "if she was so fearful, why did she confront the defendant the morning of September 8th?"
>
> The prosecutor argued that Cusick's testimony would help the jury to understand Janet's seemingly inconsistent conduct by explaining the "counterintuitive" fact that "victims of various kind[s] of abuses will return to their perpetrator, will stay in the relationship with their perpetrator until they're ready to make that decision" to leave.  When asked to provide examples of such conduct, the prosecutor answered: "For example, that she was so fearful August 22nd, the dog dies in front of her, and shortly thereafter she is telling people, sobbing, crying, telling them that she's afraid of the defendant . . . .  It is the inconsistency that she's still living at that home after she

30

has observed this and is fearful of the defendant based on that kick of the dog." The prosecutor argued that despite the fact that Janet's death precluded her from testifying at trial, Cusick's testimony was nevertheless necessary to enable the jury to assess the credibility of her various out-of-court statements.

The trial court again ruled that the testimony was admissible, noting that "the prosecution's theory of the case is that [Janet] was in an abusive relationship with her husband wherein he attempted to exercise power and control over her causing her to be afraid," which "caused her to make the decision to leave him and take the children, which thereby motivated him to kill her." After ruling that there was sufficient foundational evidence that Janet and defendant may have been in an abusive relationship, the trial court ruled that Cusick's testimony was admissible under sections 801 and 1107: "The defendant in this case has attacked the credibility of [his wife]. For instance, the defendant contends that her statements concerning the fact that the defendant kicked the dog to death were fabricated by her. The defendant has suggested that if she was really in an abusive relationship, then why did she return or why did she not leave him?" The trial court then explained that because "marital relationships are often behind closed doors" and involve "complex psychological relationships that sometimes defy logic or reason," Cusick's testimony would help the jury assess Janet's credibility by "dispelling some of the possibl[e] misconceptions held about abused women." This would also help the jury to decide "whether the defendant may have had a motive to kill his wife."

However, the trial court placed additional limitations on the testimony, explaining that Cusick "may testify about the psychological aspects that occur between victim and abuser at points when there may be a separation, but cannot make an opinion that this is the particular time when the abuser would kill the victim." The trial court also explained to the prosecutor that "it would be inappropriate in this case given the possible prejudicial effect to the defendant to give the jury hypotheticals that involve actual facts from this trial."

Prior to Cusick's testimony, the trial court admonished the jury as follows: "Her testimony about intimate partner abuse is not evidence that the defendant abused [his wife] or killed her. You may consider this evidence only in deciding whether or not [Janet's] conduct was not inconsistent with the conduct of someone who has been abused and in evaluating the believability of her statements." We will describe Cusick's testimony in detail in the analysis that follows.

## Analysis

Section 801, subdivision (a), permits expert testimony on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Section 1107, subdivision (a), provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical,

emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

"The Legislature, courts, and legal commentators have noted the close analogy between use of expert testimony to explain the behavior of domestic violence victims, and expert testimony concerning victims of rape or child abuse." (People v. Brown (2004) 33 Cal.4th 892, 905, 16 Cal. Rptr.3d 447, 94 P.3d 574 (Brown).)  In People v. Bledsoe (1984) 36 Cal.3d 236, 203 Cal. Rptr. 450, 681 P.2d 291, our Supreme Court held expert testimony concerning the behavior of rape victims to be admissible under section 801 "to rebut misconceptions about the presumed behavior of rape victims," but not "as a means of proving – from the alleged victim's post-incident trauma – that a rape in the legal sense had, in fact, occurred." (Id. at pp. 248, 251, 203 Cal. Rptr. 450, 681 P.2d 291.)  In People v. McAlpin (1991) 53 Cal.3d 1289, 283 Cal. Rptr. 382, 812 P.2d 563, a case involving the defendant's sexual abuse of a child, our Supreme Court explained:  "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation.   [Citations.]   'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'"  (Id. at pp. 1300–1301, 283 Cal. Rptr. 382, 812 P.2d 563; see also People v. Bowker (1988) 203 Cal. App.3d 385, 394, 249 Cal. Rptr. 886 ["where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust"].)

* * *

In this case, Cusick testified generally about "intimate partner abuse," defining that term as "a dynamic between two intimate partners where one of the partners tries to exert power and control over the other, and they try to exert that power and control by using a pattern and variety of abuses, and that can be physical abuse, emotional, psychological abuse, financial abuse, fear and intimidation."  As already mentioned, she explained that abusing an animal can be a form of intimidation.  She also explained that where children are involved, an abuser will often threaten to either take or harm the children, which is "the highest form of fear and intimidation that's used in families where there are children."  She also provided examples of various forms of psychological abuse, emotional abuse, sexual abuse, financial abuse, and physical abuse.

Cusick also testified about the "cycle of violence," explaining that there are three stages:  (1) an "acute-battering incident," followed

by (2) a "honeymoon or contrite stage," followed by (3) a "tension-building phase." This tension-building phase ultimately leads to another acute-battering incident, which continues the cycle indefinitely. She also explained that victims generally behave differently during the three stages. Immediately following the battering incident, the victim will typically reclaim some power from the abuser, either by threatening to leave if it happens again or by actually leaving the relationship. During the honeymoon stage, the victim will recommit to the relationship, which immediately relinquishes some power to the abuser. However, some of the victim's power remains, resulting in the reduction of certain aspects of control previously present in the relationship, sometimes for weeks or months. During the tension-building phase, the abuser attempts to reclaim the remainder of the victim's power by increasing the control exercised over the relationship. And because the victim does not want to trigger another acute-battering incident, he or she typically accommodates the abuser's demands.

Cusick also described several common misconceptions concerning victims of intimate partner abuse, including the idea that "it is easy to leave a relationship where there is domestic violence," and "once you leave an abusive relationship that you don't have to have contact with the abuser, and that's a myth when there's children involved." As she explained: "They're afraid to leave. Part of the intimidation of fear is being told generally quite often that 'if you ever leave me, I will do something really horrible to you. I will do something horrible to your family and friends. I will take the children or do something horrible to the children.' [¶] And victims read about things like this in the paper, and they see on television and they know it's true. They know the most lethal time in a [domestic violence victim's] life is right when they leave, and they have to be incredibly careful during that period of time, and they are putting themselves and their kids at risk. [¶] Also, if you have children, you leave an abuser, you are still connected to the abuser, but you have very much pissed the abuser off because many abusers say, 'You can leave, but you can't leave with the children. And you'll never get the kids,' so in leaving and taking the kids with you is a huge risk at escalating the anger of the abuser."

Cusick further explained that "victims develop what's known as coping strategies or coping mechanisms to allow them to stay in these relationships," including denying, minimizing, or rationalizing the abuse. According to Cusick, the abuser will play into these coping mechanisms by denying or minimizing the victim's experience, or by blaming the battering incident on the victim, which is part of the psychological and emotional abuse that exists in these relationships.

Defendant's challenge to this evidence is two-fold. He argues that "the threshold error was the trial court's ruling permitting Cusick to take the stand in the first place." He then argues that this threshold error "resulted in the prosecution running roughshod over the trial court's efforts to prevent the gross misuse of her testimony."

/////

33

The trial court did not abuse its discretion in allowing Cusick's testimony under sections 801 and 1107.  As defendant points out, this case is different from those discussed above because Janet's death precluded her from testifying at trial.  However, we agree with the trial court that her credibility was nevertheless at issue.  On numerous occasions, Janet stated that she was afraid of defendant.  These statements were admitted for their truth under section 1250.  Janet also told White–Janoski that defendant hit her with a metal chain.  This statement was admitted for its truth under section 1240.  However, defendant claimed that her conduct, i.e., staying in the relationship and returning to him on two prior occasions, was inconsistent with her stated fear and also inconsistent with her statement that he had physically abused her.  Cusick's testimony was necessary to disabuse jurors of commonly held misconceptions about victims of domestic violence, and to explain the psychological reasons for such a victim's seemingly self-impeaching behavior.  (See People v. McAlpin, supra, 53 Cal.3d at pp. 1300–1301, 283 Cal. Rptr. 382, 812 P.2d 563.)

And while we agree with defendant that Cusick's testimony exceeded the limits imposed by the trial court, we disagree that this amounted to prosecutorial misconduct.  "It is, of course, misconduct for a prosecutor to intentionally elicit inadmissible testimony."  (People v. Smithey (1999) 20 Cal.4th 936, 960, 86 Cal. Rptr.2d 243, 978 P.2d 1171.)  But this record does not disclose any intentional misconduct on the part of the prosecutor.  Indeed, the prosecutor informed Cusick prior to her testimony that she was not allowed to testify "that victims of domestic violence are killed purposefully at a particular point in time."  Cusick violated this directive by testifying that domestic violence victims "know the most lethal time in [their] life is right when they leave, and they have to be incredibly careful during that period of time, and they are putting themselves and their kids at risk."  However, the question that triggered this violation was simply, "why don't victims of abuse just leave?"  This question was properly aimed at dispelling a common misconception held about abuse victims, i.e., that it is easy for them to leave an abusive relationship.  Cusick could have answered that question without violating the trial court's ruling.

Defendant also complains that the prosecutor asked Cusick whether certain abusers have more education regarding domestic violence, prompting Cusick to respond:  "Well, generally perpetrators who are in position[s] of power and privilege can be educated in terms of the court system, in terms of having more resources, in terms of, let's say, a doctor knowing where on the body bruises would occur.  In terms of a police officer knowing how to use their body and their voice and their facial expression to be intimidating."  When the prosecutor followed up by asking whether her experience with police officer abusers changed any of the types of abuse she had already discussed, the trial court sustained a defense objection and admonished the prosecutor:  "I'm going to limit your direct examination to the areas of general abuse the witness has been describing and not to the particular possible facts of this case."  While expert testimony on domestic violence may include general

descriptions of abuser behavior in order to "explain the victim's actions in light of the abusive conduct" (People v. Gadlin (2000) 78 Cal. App.4th 587, 595, 92 Cal. Rptr.2d 890), this testimony specifically referred to police officers and was not aimed at elucidating victim conduct in order to dispel any common misconception. However, we do not believe that this misstep by the prosecution rises to the level of prosecutorial misconduct.[10]

In any event, there was no prejudice to defendant. All inquiry into police officers as abusers was promptly shut down by the trial court. And following the statement regarding leaving an abuser as being a "lethal time," the trial court provided the jury with the following admonition: "The [c]ourt has allowed the testimony of . . . Cusick on the topic of abusive relationships in general. The witness has described various types of abuse and how victims generally react. This is not evidence, however, that the defendant was an abuser or that he killed [his wife], and you must look to other evidence presented in this trial to make that determination. You may only consider this evidence in deciding whether or not [Janet's] conduct was not inconsistent with the conduct of someone who has been abused and in evaluating the believability of her statements." We presume the jury followed this instruction. (People v. Sanchez (2001) 26 Cal.4th 834, 111 Cal. Rptr.2d 129, 29 P.3d 209; People v. Holt (1997) 15 Cal.4th 619, 662, 63 Cal. Rptr.2d 782, 937 P.2d 213.) Moreover, to the extent the jury relied on Cusick's testimony to conclude defendant abused his wife, and therefore had a motive to kill her, other evidence would likely have yielded the same conclusion. (See People v. Bowker, supra, 203 Cal. App.3d at p. 395, 249 Cal. Rptr. 886.)

People v. Kovacich, 201 Cal.App.4th at 896-904.

/////

/////

---

[10]   Defendant also complains that the prosecutor elicited testimony about animal abuse. However, as he did not claim that eliciting such testimony amounted to prosecutorial misconduct below, he cannot do so on appeal. (See People v. Tafoya (2007) 42 Cal.4th 147, 176, 64 Cal. Rptr.3d 163, 164 P.3d 590.) In any event, we conclude that Cusick's testimony concerning animal abuse in general was properly admitted. When expert testimony concerning domestic violence is properly admitted to explain the victim's conduct in light of the abuse, "testimony about the hypothetical abuser and hypothetical victim is needed for the [victim's conduct] to be understood . . . . [L]imiting the testimony to the victim's state of mind without some explanation of the types of behaviors that trigger the [victim's conduct] could easily defeat the purpose for which the expert is called." (People v. Gadlin, supra, 78 Cal. App.4th at p. 595, 92 Cal. Rptr.2d 890.) Cusick's testimony about animal abuse was part of her general testimony about the types of abuses that may or may not exist in abusive relationships. And without this testimony, the jury might not have understood that abusing an animal is taken to be a form of threat to the victim, which would cause the victim to be afraid of leaving the relationship. Thus, the trial court did not abuse its discretion in allowing this testimony, and the prosecutor did not engage in misconduct by eliciting it.

### 3. Applicable Law and Analysis

As noted above, errors of state law do not warrant the granting of federal habeas relief. Estelle, 502 U.S. at 67. "The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Estelle, 502 U.S. at 67-68). See also Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012) ("On habeas review, constitutional errors of the "trial type," . . ., warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.') (quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)).

A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)). Evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted). Thus, the admission of evidence at trial violates due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal, 926 F.2d at 920. Put another way, evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process. Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

1    Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  The Ninth Circuit has also observed

2    that the United States Supreme Court has not squarely addressed whether rules of evidence

3    regarding the admissibility of expert testimony, similar to the rule employed by the trial court in

4    this case, "infring[e] upon a weighty interest of the accused" or are "arbitrary or disproportionate

5    to the purposes [they are] designed to serve."  Moses v. Payne, 555 F.3d 742, 758 (9th Cir. 2009)

6    (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)).  Therefore, "under AEDPA, even

7    clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit

8    the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as

9    laid out by the Supreme Court."  Holley, 568 F.3d at 1101.  See also Greel v. Martel, No. 10-

10   16847, 472 Fed. Appx. 503, 504, 2012 WL 907215, *1 (9th Cir. Mar. 19, 2012) ("There is

11   likewise no clearly established federal law that admitting prejudicial evidence violates due

12   process.").[11]

13        In light of the authorities cited above, the state appellate court's rejection of petitioner's

14   claim that the trial court violated his right to due process in allowing the admission of unduly

15   prejudicial evidence does not support the granting of federal habeas relief under AEDPA.

16   Petitioner has cited no "clearly established federal law" prohibiting the admission of evidence that

17   is relevant to the state of mind of a domestic abuse victim, even if that evidence may be viewed as

18   inflammatory.  Holley, 568 F.3d at 1101

19        Nor did the admission of the challenged evidence violate petitioner's right to due process.

20   After a careful review of the record, the undersigned concludes that the admission of evidence of

21   the dog kicking incident and the effect of domestic violence on the victim of such violence was

22   not so unduly prejudicial as to "necessarily" prevent a fair trial, given the other evidence of

23   petitioner's guilt and the relevance of the challenged testimony.  Jammal, 926 F.2d at 919-20

24   (erroneous admission of evidence in a state trial denies a defendant due process only when the

25   evidence "so fatally infect[s] the proceedings as to render them fundamentally unfair").  With

26   respect to the testimony of expert witness Marjorie Cusick, the  jury at petitioner's  trial was

27

28   [11]  Citation to this unpublished Ninth Circuit opinion issued after January 1, 2007 is appropriate
     pursuant to Ninth Circuit Rule 36-3(b).

1    given an appropriate cautionary instruction.  (CT at 2498).  This federal habeas court must

2    presume that the jurors followed this instruction, which would have lessened any possible

3    prejudice caused by the admission of Ms. Cusick's testimony.  See Blueford v. Arkansas, 566

4    U.S. ___, ___, 132 S. Ct. 2044, 2051 (2012); Richardson v. Marsh, 481 U.S. 200, 206 (1987);

5    Deck v. Jenkins, 768 F.3d 1015, 1023 (9th Cir. 2014); Fields v. Brown, 503 F.3d 755, 782 (9th

6    Cir. 2007).

7        Petitioner has also failed to show that the prosecutor committed misconduct at his trial by

8    the manner in which he questioned Ms. Cusick in light of the trial court's previous orders limiting

9    the scope of her testimony.  On habeas review of a prosecutorial misconduct claim, the court may

10   grant relief only if the misconduct rises to the level of a due process violation.  See Sechrest v.

11   Ignacio, 549 F.3d 789, 807 (9th Cir. 2008) ("On federal habeas review, the narrow issue before us

12   is whether the prosecutor's comments violated the defendant's due process right to a fair trial . . .

13   ."); see also Deck, 768 F.3d at 1022; Wood, 693 F.3d at 1113.  For the reasons expressed by the

14   California Court of Appeal, the questions asked by the prosecutor of Ms. Cusick did not call for

15   testimony in violation of the trial court's in limine ruling and did not render petitioner's trial

16   fundamentally unfair.

17       Petitioner has failed to demonstrate that the decision of the California Court of Appeal

18   rejecting these due process claims was contrary to or an unreasonable application of federal law.

19   He has certainly failed to show that the state appellate court's thoughtful and thorough opinion

20   was "so lacking in justification that there was an error well understood and comprehended in

21   existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

22   Accordingly, he is not entitled to federal habeas relief with respect to these claims that his right to

23   due process was violated.

24       **C.  Trial Court's Erroneous Exclusion of Evidence**

25       Petitioner also raises several claims regarding the trial court's alleged improper exclusion

26   of evidence.  In his fourth ground for relief, petitioner claims that the trial court violated his

27   federal constitutional rights in:  (1) failing to allow the defense to introduce evidence regarding an

28   alleged "sighting" of a woman matching Janet's description on the afternoon of September 8,

1   1982 by Lyle Fullerton, an employee of a grocery store frequented by Janet; (2) failing to allow

2   the defense to introduce evidence regarding another alleged sighting of Janet by Roberto Taneida,

3   who related to police that a woman matching Janet's description told him she was being forced to

4   "go with" a person who had "threatened to harm her children;" and (3) failing to allow the

5   defense to introduce evidence from a person named Kelly Ray Thompson, who admitted to

6   killing a woman in the Rollins Lake Area and "cutting off her head and throwing the head into the

7   lake."  (ECF No. 1 at 17-18.)

8           In his fifth ground for relief, petitioner claims that the trial court 'erred" in excluding from

9   trial defense evidence concerning the "bias" of Jerry Johnson, the chief police investigator, "and

10   many other investigative defects."  Petitioner also claims the trial court erred in refusing to give a

11   jury instruction requested by the defense "concerning the bias" of Officer Johnson.  (Id. at 20.)

12   As he did in support of his second claim for relief, petitioner includes numerous examples of

13   events and trial testimony that he believes demonstrate Officer Johnson's bias against him and the

14   improper nature of the police investigation into Janet's disappearance.  (Id. at 22-32.)  Petitioner

15   also complains, again, that a "media blitz" about his case was improperly instigated by Officer

16   Johnson, who was only a reserve police officer and who harbored "animosity" towards petitioner.

17   (Id.)  Petitioner contends that Officer Johnson fed "damaging and false information to potential

18   witnesses in the case" which led to misleading testimony at his trial.  (Id. at 20-32.)  In his

19   opening brief on appeal, petitioner's appellate counsel had the following to say about Jerry

20   Johnson and his involvement in the investigation of this case:

21                      In 2002 a major push to reopen the case came from two retired
                    sheriff's deputies, one of whom, Dave Milam, died of cancer soon
22                  thereafter, and the other of whom, Jerry Johnson, had been involved
                    in civil litigation against Paul Kovacich in the mid 1980s.  As a
23                  volunteer reserve officer for the Auburn Police Department,
                    Johnson conducted many interviews, often providing information
24                  about the case to potentially favorable witnesses, advising them to
                    exchange information among themselves, and to review reports
25                  about the case on the internet; on the other hand, Johnson avoided
                    conducting interviews of persons who might have exculpated Paul.
26                  Johnson obtained warrants for wiretaps on Paul Kovacich's phones
                    and for tracking devices attached to his vehicles, but no
27                  incriminating information was obtained therefrom.  Nonetheless, In
                    September of 2006, through Johnson's efforts, the Placer County

28

1
District Attorney's office obtained an indictment of Paul Kovacich
for the murder of Janet Kovacich.

2

3     (Resp't's Lod. Doc. 37 at 2.)

4         All of the above-described claims were raised for the first time in a habeas petition filed

5     by petitioner in the California Supreme Court.  That petition was summarily denied.  (Resp't's

6     Lod. Doc. 43.)  Accordingly, this court must review the state court record to determine whether

7     there was any "reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.  In

8     doing so this court "must determine what arguments or theories . . . could have supported, the

9     state court's decision; and then it must ask whether it is possible fairminded jurists could disagree

10    that those arguments or theories are inconsistent with the holding in a prior decision of [the

11    Supreme] Court."  Id. at 102.

12        "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a

13    complete defense' and the right to present relevant evidence in support thereof.  Nevada v.

14    Jackson, ___U.S.___, ___, 133 S. Ct. 1990, 1992 (2013) (quoting Crane v. Kentucky, 476 U.S.

15    683, 690 (1986).  See also Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  Nonetheless,

16    the United States Supreme Court has not "squarely addressed" whether a state court's exercise of

17    discretion to exclude testimony at trial violates a criminal defendant's right to present relevant

18    evidence.  Moses, 555 F.3d at 758-59; see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir.

19    2011) ("Between the issuance of Moses and the present, the Supreme Court has not decided any

20    case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present

21    a complete defense or 'establish[ing] a controlling legal standard' for evaluating such

22    exclusions."), cert. denied, ___U.S.___, 132 S. Ct. 593 (2011)).  However, the Supreme Court has

23    rejected the argument that due process necessarily requires the exclusion of prejudicial or

24    unreliable evidence.  See Perry v. New Hampshire, ___U.S.___, ___ 132 S. Ct. 716, 728 (2012);

25    Spencer v. Texas, 385 U.S. 554, 563-564 (1967).

26        Accordingly, the decision of the California Supreme Court rejecting petitioner's challenge

27    to the trial court's decision to exclude from introduction at trial the evidence described above was

28    not contrary to or an unreasonable application of clearly established federal law and may not be

set aside.  Id.  See also Knowles v. Mirzayance, 556 U.S. 111, 112 (2009) ("it is not 'an

unreasonable application of' 'clearly established Federal law' for a state court to decline to apply

a specific legal rule that has not been squarely established by [the United States Supreme

Court]"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (relief is "unauthorized" under Section

2254(d)(1) when the Supreme Court's decisions "give no clear answer to the question presented,

let alone one in [the petitioner's] favor," because the state court cannot be said to have

unreasonably applied clearly established federal law); Hedlund v. Ryan, 750 F.3d 793, 799 (9th

Cir. 2014).

Here, petitioner has also failed to demonstrate that any of the trial court's challenged

evidentiary rulings violated his right to due process.

> As applied to a criminal trial, denial of due process is the failure to
> observe that fundamental fairness essential to the very concept of
> justice.  In order to declare a denial of it we must find that the
> absence of that fairness fatally infected the trial; the acts
> complained of must be of such quality as necessarily prevents a fair
> trial.

Lisenba v. California, 314 U.S. 219, 236 (1991) (holding that admission of coerced confession

violates due process).  The United States Supreme Court has "defined the category of infractions

that violate 'fundamental fairness' very narrowly."  Medina v. California, 505 U.S. 437, 443

(1992) (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)).  See also Hayes v. Ayers,

632 F.3d 500, 515 (9th Cir. 2011).

With regard to the trial court's exclusion of defense evidence of alleged "sightings" of

Janet, the undersigned notes the following.  Petitioner's trial counsel argued during a hearing on

motions in limine that the investigation into this case had not been sufficiently thorough.

(Reporter's Transcript on Appeal (RT) at 856-57.)  He noted that store clerk Lyle Fullerton

reported seeing a woman matching Janet Kovacich's picture at his store shortly after her

disappearance.  (Id. at 857.)  Defense counsel stated that this evidence was not pursued by the

prosecution and that Fullerton was now deceased and could not appear as a trial witness.  (Id. at

858-59.)  Defense counsel argued that this lack of follow-up demonstrated that petitioner had

/////

41

1    been prejudiced by "the lack of investigation and the passage of time that's occurred here."  (Id.

2    at 861.)

3            The prosecutor, on the other hand, noted that Mr. Fullerton had in fact been interviewed

4    and told police he could not be certain the woman he saw was the same woman on the missing

5    person poster and that he did not think he could pick the woman out of a photo lineup.  (Id.; ECF

6    No. 1, Ex. 9.)  When the trial judge asked defense counsel whether he was seeking to introduce

7    the testimony of Mr. Fullerton at trial and, if so, how he would "propose to do it," defense

8    counsel conceded that he was not "certain that there's any sort of evidentiary foundation that

9    allows its introduction."  (RT at 861.)  In the end, petitioner's trial counsel did not seek to have

10   evidence about Mr. Fullerton's alleged possible sighting of Janet admitted into evidence at trial.

11   Therefore, the trial court was not asked to, and did not, issue any ruling on the matter.

12           In another discussion during the hearing on pretrial motions in limine, the prosecution

13   moved to exclude from the trial evidence that a Robert Taneida had reported seeing a person

14   matching Janet's description.  (Id. at 908.)  Petitioner's counsel noted the police had obtained Mr.

15   Taneida's statement in 1983 but that "no discovery is provided to the defense, and we do not

16   learn about this except just by happenstance."  (Id.  See also ECF No. 1, Ex. 11.)  Petitioner's trial

17   counsel argued that the information was relevant because it "goes to the investigation conducted

18   originally back in 1982 and 1983 as to what was done, what was not done, what was followed up

19   on, what was not followed up on," and that it was also relevant to "the competence or the quality

20   of the investigation."  (RT at 908-09.)

21           Later, during the same hearing on motions in limine, the prosecution sought to exclude

22   from the trial evidence that a person named Kelly Ray Thompson had confessed "to about eight

23   murders, and one of those murders he said he committed – he said he committed the murder in

24   September or October of 1995 . . . this murder happened near this lake in Placer County; that it

25   was a woman, and that he cut off her head, and that . . . the woman was driving a small pickup."

26   (Id. at 896.)  The prosecutor explained that Placer County detectives were unable to corroborate

27   "anything that Mr. Thompson said" and were unable to connect Thompson's confession with

28   /////

42

Janet's murder.  (Id. at 896-98.)  Petitioner's counsel, on the other hand, argued that this evidence was "certainly relevant" to petitioner's defense.

The following colloquy then took place between the court and counsel:

> THE COURT:  Well, Part 2 of my inquiry, then, goes back to you, Mr. Spurling [petitioner's trial counsel].  If your – I thought you said that you may attempt to introduce this as a third party's – evidence of a third party by way of possibly a declaration as to an interest.  But don't you have a problem if it turns out that the officer who prepared this statement is really hearsay, because he talked to the investigator from Washington, and that person spoke to Mr. Thompson?  So in other words, you don't – you have, like, a layer of hearsay built in there.  So if you were to proffer this, you would have that problem, as far as I can tell, possibly, legally.  Further, it seems that you don't have the actual statement the guy made, so –

> MR. SPURLING:  That would be my –

> THE COURT:  - it puts the Court in a quandary [sic] as to how I was to rule on this when I – when I don't have any evidence as to what the exact statement was.  Because if you were asking me to introduce that under that theory, then the Court would have to review the particular statement to make a finding of whether or not it is a declaration against his penal interests, or whether it's trustworthy, whether I would allow that to go to the jury.  So that's two inquiries.

> I wanted to further see the statement that the prosecution had, if both parties would agree to that.

> Secondly, I ask you, Mr. Spurling, how do you – what I see as possibly, a legal hurdle, before I can even get to that issue, how would you intend to overcome that.

> MR. SPURLING:  Well, I would tend to share the Court's perception as to the multiple layers, possibly, of hearsay in that regard.

> THE COURT:  Have you made any effort to locate Mr. Thompson or subpoena him or have him brought down or anything?

> MR. SPURLING:  No.

(Id. at 938-39.)   Ultimately, the trial court asked petitioner's trial counsel whether he wanted to "get [Thompson's] confession into evidence somehow."  Defense counsel responded to that inquiry by stating "I would concede that there does appear to be some hearsay issues with that." (Id. at 942.)

/////

1   After hearing extensive argument from the parties on the motions in limine, the trial court

2   refused to admit evidence at petitioner's trial regarding statements allegedly made by Kelly Ray

3   Thompson, as well as all the other proposed defense evidence suggesting possible third-party

4   culpability, on the grounds that petitioner had not "proffered any direct or circumstantial evidence

5   linking any third party to the murder of Janet Kovacich." (Id. at 1030.)  The trial court ruled that

6   petitioner would not "be permitted to cross-examine investigators concerning the details of

7   unsolved murders or disappearances, other bones or bodies not connected to this, or statements of

8   others" on the basis that "to allow this would likely require the prosecution to respond by

9   introducing further evidence concerning these unconnected incidents and would consume an

10   undue consumption of time on a collateral matter that has little relevance." (Id. at 1033.)

11   Evidence of potential third-party culpability must only be admitted at trial when, under the

12   "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a

13   fair trial.  The Ninth Circuit has determined that where the proffered evidence of third party

14   culpability simply affords a possible ground of suspicion pointing to a third party and does not

15   directly connect that person with the actual commission of the offense, such evidence may

16   properly be excluded.  People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993)

17   (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)); see also United States v. Bowman,

18   215 F.3d 951, 962 (9th Cir. 2000).  Under the circumstances of this case, the trial judge's ruling

19   with regard to possible evidence suggesting third party culpability, including evidence about the

20   alleged "confession" of Kelly Ray Thompson and/or alleged sightings of Janet after her

21   disappearance, did not render petitioner's trial fundamentally unfair.  Petitioner has not provided

22   this federal habeas court any competent evidence directly connecting Kelly Ray Thompson or any

23   other person with the disappearance and murder of Janet Kovacich.

24   Petitioner's trial counsel also sought to introduce extensive evidence regarding the alleged

25   bias of Officer Jerry Johnson and his conduct of the investigation into Janet's murder.  (RT at

26   962, et seq.)  The trial judge ruled that the defense would be allowed to cross-examine

27   government witnesses on the issue of their bias against petitioner.  The trial judge also stated he

28   was willing to give petitioner "wide latitude in that regard." (Id. at 1032-33.)  The trial court

made the following rulings with respect to Officer Johnson in particular:

> Jerry Johnson.  The defendant may inquire of the prosecution witness, Jerry Johnson, whether Johnson once sued the defendant in a small claims court regarding – over costs regarding payment of pasture costs.  If the witness conceded that such a suit occurred, the Court will limit the scope of further inquiry to that fact.  The Court feels this evidence may bear upon the witness' bias and a limited inquiry will be permitted.

> Pursuant to Evidence Code 352, the Court will exclude the cross-examination of other – or other evidence that witness Johnson was the subject of some form of disciplinary hearing from Sheriff Nunes wherein the sheriff authored a letter stating that Mr. Johnson was misleading.  It appears that this involved a dispute over personnel action and is not connected to this case.  The Court is concerned of the confusion of issues possibility and the undue consumption of time in this regard, and I will not allow it.

> Apparently, the defendant – Mr. Johnson was also involved in the investigation of the defendant more recently in 2005 over an allegation that the defendant may have misappropriated funds from a bank account for a police association where he was the chairman.  No charges were ever filed against the defendant for this conduct.  The defendant wishes to cross-examine Mr. Johnson concerning this investigation on the grounds it may show a bias on behalf of Mr. Johnson.

> Because the defendant and Mr. Johnson apparently have known one another since before the disappearance of Janet Kovacich, the defendant does have a right to a thorough cross-examination of Mr. Johnson regarding any personal bias or animosity he may hold against the defendant.  Again, the Court is concerned, however, that cross-examination by the defendant on collateral matters may consume an inordinate amount of time, particularly involving issues that could confuse the jurors.  However, the Court will permit the defendant to conduct only a limited cross-examination into the area of this 2005 investigation of fraud by the defendant.  The Court, however, will not allow extensive inquiry concerning the underlying facts.  Mr. Johnson will be permitted to explain to the jury his reasons for conducting the investigation.  The Court will not permit extrinsic evidence of whether or not the defendant did, in fact, commit some form of fraud.

(Id. at 1036-38.)

Petitioner has failed to show that these trial court's rulings, with respect to the extent the alleged bias of Officer Johnson could be explored at trial, violated his right to due process.  The undersigned also notes that, regardless of Officer Johnson's motives in reviving the investigation into Janet Kovacich's murder and/or his methods of investigation, a jury found petitioner guilty of this murder beyond a reasonable doubt after hearing all of the admissible evidence at his trial.

1    Petitioner has not demonstrated that the investigation conducted by Jerry Johnson, or Johnson's

2    possible bias against petitioner, resulted in petitioner being convicted of crimes he did not

3    commit.  While petitioner may be unhappy or disappointed that Officer Johnson re-opened the

4    police investigation of this matter many years after the initial investigation was closed, he has not

5    demonstrated before this court that any of Officer Johnson's actions in conducting that re-opened

6    investigation rendered the proceedings fundamentally unfair.

7            For all of the reasons set forth above, petitioner is not entitled to federal habeas relief on

8    his claims challenging the trial court's exclusion of defense evidence at his trial.

9            **D.  Presentation of Evidence to the Grand Jury**

10           Petitioner raises several claims concerning the presentation of evidence before the grand

11   jury that indicted him.  The court will address these claims in turn below.

12                          **1.  Suppression of Exculpatory Evidence**

13           In his sixth ground for relief, petitioner claims that the prosecution "knowingly suppressed

14   exculpatory evidence" before the Grand Jury of "sightings" of Janet Kovacich occurring after her

15   disappearance.  (ECF No. 1 at 34-35.)  In the body of this claim, petitioner provides numerous

16   examples of evidence he believes should have been presented to the grand jury by the prosecutor.

17   (Id. at 53-85.)  Petitioner also attaches a motion filed by his trial counsel seeking to dismiss

18   portions of the amended indictment brought against him on the grounds that the prosecutor

19   violated state and federal law in failing to inform the grand jury that:  (1) Donald Henrickson, a

20   forensic pathologist with the Placer County Office of the Sheriff-Coroner, had opined that the

21   hole in Janet's skull could have been caused by a bullet or blunt-force trauma; (2) the presence of

22   metallic fragments in the skull were consistent with the "film developing process" and were not

23   necessarily suggestive of a gunshot wound; and (3) it was not possible to determine whether the

24   fracture in Janet's skull occurred before or after her death.  (Id. at 41-42.)  Petitioner argues that

25   "he would assume it was the duty of the prosecutor . . . to disclose all evidence, testimony and

26   any and all facts that may expose the truth so as the Grand Jury could properly and correctly

27   adjudicate the case before them."  (Id. at 54.)  This claim was raised for the first time in

28   /////

                                              46

1   petitioner's application for a writ of habeas corpus filed in the California Supreme Court.  That

2   petition was summarily denied.

3        "[I]ndictment by grand jury is not part of the due process of law guaranteed to state

4   criminal defendants by the Fourteenth Amendment."  Branzburg v. Hayes, 408 U.S. 665, 688

5   n.25 (1972) (citing Hurtado v. California, 110 U.S. 516, 534-35 (1884) (no due process right to a

6   grand jury indictment before criminal prosecution in state court)).  See also Peterson v.

7   California, 604 F.3d 1166, 1169-70 (9th Cir. 2010) (denying habeas relief on a claim that

8   petitioner's Sixth Amendment confrontation rights were violated at a preliminary hearing because

9   there is no federal constitutional right to a preliminary hearing); Bazzo v. Soto, NO. EDCV 12-

10  2112-CJC (DTB), 2015 WL 3561733, *31 (C.D. Cal. Mar. 3, 2015) ("[T]he right to presentation

11  of a criminal case to a grand jury in federal criminal proceedings under the Fifth Amendment has

12  not been extended to the states via the Fourteenth Amendment."), adopted by 2015 WL 3561735

13  (C.D. Cal. June 2, 2015).  Accordingly, petitioner is not entitled to relief on his claim that the

14  prosecutor committed misconduct before the grand jury.

15       Even if the Fifth Amendment right to a grand jury did apply to the states, petitioner would

16  not be entitled to federal habeas relief with respect to this claim.  This is because even if any

17  cognizable misconduct[12] took place, any claimed constitutional violation was rendered harmless

18  by petitioner's subsequent conviction at trial.  United States v. Mechanik, 475 U.S. 66, 70 (1986)

19  ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to

20  believe that the defendants were guilty as charged, but also that they are in fact guilty as charged

21  beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury

22  proceeding connected with the charging decision was harmless beyond a reasonable doubt."); see

23

24  ――――――――――――――――――
    [12]  Such appears not to be the case under any circumstances pursuant to federal law.  See United
25  States v. Calandra, 414 U.S. 338, 344-45, 349-52 (1974) (federal prosecutor have no duty to
    withhold inadequate or incompetent evidence from the grand jury); Costello v. United States, 350
26  U.S. 359, 361-64 (1956); United States v. Haynes, 216 F.3d 789, 798 (9th Cir. 2000) (Federal
    "prosecutors have no obligation to disclose 'substantial exculpatory evidence' to a grand jury, . . .
27  even if that evidence impeaches the credibility of a key witness."); United States v. Lasky, 600
    F.2d 765, 768 (9th Cir. 1979) ("the prosecution was not required to present the grand jury with
28  evidence which would tend to negate guilt").

also Williams v. Stewart, 441 F.3d 1030, 1042 (9th Cir.2006) ("any constitutional error in the grand jury proceedings is harmless because [the petitioner] was ultimately convicted of the offenses charged); People of Territory of Guam v. Muna, 999 F.2d 397, 399 (9th Cir.1993) ( "If . . . a petit jury subsequently convicts a defendant of the charges upon which he was indicted, 'any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt.'" (quoting Mechanick, 475 U.S. at 70)).[13]

Finally, the undersigned notes that the state trial court concluded that the prosecution's failure to inform the grand jury of arguably favorable evidence regarding the cause of Janet's death did not affect the outcome of the proceedings or result in any prejudice to petitioner. Specifically, the trial court ruled as follows:

> The question then is this:  Is it reasonably probable that a result more favorable for the defendant would have been reached had the grand jury been informed of Dr. Henrikson's opinion and the apparent problems with the X-ray?
>
> Given the strength of Dr. Willey's opinion as opposed to the equivocal opinion of Dr. Henrikson, the Court – the record does not reflect a probability that had the grand jury been informed of the omitted items, that it would not have found probable cause to indict.
>
> The Court cannot find that the omissions affected the outcome.  For that reason, the defendant was not prejudiced by the prosecution's failure to reveal exculpatory evidence to the grand jury. Accordingly, that portion of the defendant's motion seeking dismissal of the allegation that the defendant personally used a firearm in the commission of the offense described in the indictment is denied.

(Resp't's Lod. Doc. 15 at 36.)

Petitioner has failed to demonstrate that the trial court's rulings in this regard were erroneous.  He has also failed to show that his trial proceedings were rendered fundamentally unfair by the prosecutor's failure to present the claimed potentially exculpatory evidence to the grand jury.  For all of the reasons set forth above, petitioner is not entitled to federal habeas relief on his claim that his federal constitutional rights were violated by the prosecution's suppression of exculpatory evidence before the grand jury.

---

[13]  Of course, any claim that the prosecution violated California law in failing to present evidence to the grand jury is not cognizable in this federal habeas corpus action.

48

## 2. Presentation of False Information

In his thirteenth ground for relief, petitioner claims that the prosecutor in his case committed misconduct in presenting knowingly false information to the grand jury.  (ECF No. 1 at 143.)  In this regard, petitioner argues:

> There are strong indications that prosecutors and the court not only refused to repress any abuses of the investigatory power exercised by the Grand Jury but actually encouraged the misinformation, lack of information and knowingly supported the witness untruthfulness. Frankly, the prosecution apparently supported the lies of witnesses in order to impress the Jury with a false characterization of Petitioner.

(Id.)  In support of his contention, petitioner provides a lengthy recitation of witnesses who appeared before the grand jury and the testimony they gave that he believes was untruthful.  (Id. at 143-49.)  As one example, petitioner alleges:

> Reserve Officer Jerry Johnson apparently told the Grand Jury that Petitioner swung his do[g] like a helicopter at a K-9 training session.  Refer to Exhibit 49A&B and 50A&B.  Defense Attorney Tom Leupp confronted District Attorney Gong regarding the comment at a pre-trial hearing with Judge Couzens.   District Attorney Gony [sic] advised the Court that Reserve Officer Jerry Johnson's statement was not relevant as the prosecution was not going to use the statement at trial.  Might one assume that the Grand Jury heard a false deceptive statement with the sole purpose of indicting the Petitioner?  District Attorney Gong knew that all of the existing full-time deputies whom were assigned to the Placer County K-9 Unit that would have attended any canine session would not have supported such an absurd statement that was given by Reserve Officer Jerry Johnson.

(Id. at 145.)  Petitioner argues that a prosecutor has a duty "not to permit a person to stand trial when he knows that perjury permeates the indictment."  (Id. at 148.)  He asks,

> [d]oes not Law Enforcement have a moral and civil duty to follow-up on claims made in the course of an investigation?  Further more [sic] doesn't D.A. Gong have a duty to inform the Grand Jury of Law Enforcement's failure to investigate an apparent crime in a complete and thorough fashion?

(Id. at 149.)

For the reasons set forth above with respect to his claim challenging the prosecutor's alleged failure to present alleged exculpatory evidence to the grand jury, this claim based on the alleged presentation of false evidence to the grand jury is not cognizable in these federal habeas

1    proceedings.  Moreover, if it was cognizable any such error was rendered harmless as a result of

2    petitioner's conviction at trial.  Finally, even assuming arguendo that this claim is cognizable in

3    this federal habeas proceeding, petitioner is not entitled to relief.

4         A violation of a defendant's rights occurs if the government knowingly uses false

5    evidence in obtaining a conviction.  Albright v. Oliver, 510 U.S. 266, 299 (1994) ("It is, . . ., well-

6    established that adherence to procedural forms will not save a conviction that rests in substance

7    on false evidence or deliberate deception."); Giglio v. United States, 405 U.S. 150, 153-54

8    (1971); Napue v. Illinois, 360 U.S. 264, 269 (1959); Soto v. Ryan, 760 F.3d 947, 957-58 (9th Cir.

9    2014).  It is clearly established that "a conviction obtained by the knowing use of perjured

10   testimony must be set aside if there is any reasonable likelihood that the false testimony could

11   have affected the jury's verdict."  United States v. Bagley, 473 U.S. 667, 680 n.9 (1985).  See

12   also United States v. Agurs, 427 U.S. 97, 103 (1976) ("the Court has consistently held that a

13   conviction obtained by the knowing use of perjured testimony is fundamentally unfair"); Hall v.

14   City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012) ("there is a clearly established

15   constitutional due process right not to be subjected to criminal charges on the basis of false

16   evidence that was deliberately fabricated by the government.") (quoting Devereaux v. Abbey, 263

17   F.3d 1070, 1074-75 (9th Cir. 2001) (en banc)).

18        The undersigned has read all of the examples provided by petitioner in support of his

19   argument that the prosecutor in his case committed misconduct in presenting false testimony to

20   the grand jury.  Petitioner has filed to demonstrate that any material information was knowingly

21   withheld or presented by the prosecutor or that any false evidence could have affected the

22   judgment of the jury at his trial.  The decision of the California Supreme Court rejecting

23   petitioner's argument on this issue was not contrary to or an unreasonable application of the

24   federal authorities cited above, nor was it objectively unreasonable.  Accordingly, petitioner is

25   also not entitled to federal habeas relief with respect to this claim.

26   **E.  Police Investigation**

27        In his seventh ground for relief, petitioner claims that the police investigation Janet's

28   death was incompetent and lacked thoroughness.  (ECF No. 1 at 87.)  He complains that the

50

1  police failed to interview "crucial witnesses" or to obtain physical evidence documenting his

2  whereabouts on the day of Janet's disappearance.  Petitioner includes numerous suggestions as to

3  how the police investigation could have been better pursued and cites numerous examples of

4  areas where he believes the investigation was sloppy or incomplete.  (<u>Id.</u> at 87-107.)  Petitioner

5  also once again attacks the credibility and motivations of Officer Jerry Johnson.  (<u>Id.</u>)  This claim

6  was raised for the first time in petitioner's application for a writ of habeas corpus which he filed

7  in the California Supreme Court.  As noted above, that petition was summarily denied.

8       Petitioner has failed to demonstrate that the decision of the California Supreme Court

9  rejecting this claim was contrary to or an unreasonable application of federal law.  Indeed,

10  petitioner has not cited any authority in support of his arguments for federal habeas relief with

11  respect to this claim.  In particular, petitioner has not cited any federal decision holding that due

12  process requires the police to seek and find exculpatory evidence, that prosecutors have a duty to

13  seek evidence that is adequate, competent or exculpatory, or that a habeas petitioner's federal

14  constitutional rights are violated by a pretrial investigation that the petitioner believes is not

15  sufficiently thorough.[14]  In light of this lack of authority on point, the state court did not

16  unreasonably apply federal law in concluding that petitioner was not entitled to relief with respect

17  to this claim.  <u>See</u> <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court

18  precedent creates clearly established federal law relating to the legal issue the habeas petitioner

19  raised in state court, the state court's decision cannot be contrary to or an unreasonable

20  application of clearly established federal law.") (citation omitted).

21       Assuming arguendo that this claim of an inadequate police investigation is cognizable in

22  this federal habeas action, petitioner has failed to demonstrate prejudice in light of the extensive

23  evidence introduced at his trial which supported the jury's guilty verdict and the fact that he was

24  indeed convicted by the jury which heard that evidence at trial.  Nor has petitioner made any

25  showing that a more thorough investigation by law enforcement would have resulted either in a

26  _____

[14]   In contrast, it has been recognized that at trial prosecutors have a duty under the Fifth
27  Amendment due process clause "to bring to the attention of the court or of proper officials all
   significant evidence suggestive of innocence or mitigation."  <u>Imbler v. Pachtman</u>, 424 U.S. 409,
28  427 n.25 (1976).

decision by the District Attorney's Office not to prosecute him for Janet's murder or in an

acquittal at trial if charged.  Accordingly, he is not entitled to federal habeas relief on his claim

that police investigation of Janet's death was inadequate.

### F.  Failure to Turn Over Exculpatory Material to the Defense

In his eighth ground for relief, petitioner claims that the prosecutor failed to disclose the

following information to the defense:

> pre-trial surveillance reports including audio and video information
> that may assist Petitioner in detailing exculpatory evidence.
> Suppression of exculpatory evidence that includes but not limited to
> all surveillance video tapes, audio recordings, statements and
> reports by all undercover officer/agents, all "in house" jail audio
> and video recordings including Placer County Probation Officers
> sentencing interview, recorded telephone conversations with
> Petitioner's attorney via Foresthill Telephone Co., jail informants
> (including ex-correctional officer) and all of Reserve Officer Jerry
> Johnson's phone and jail recordings.

(ECF No. 1 at 109.)  Petitioner explains that "numerous allied agencies assisted Reserve Officer

Jerry Johnson in his attempt to discredit the petitioner," but that "none or very little of this

potentially crucial information that could prove Petitioner's innocence was released in the form of

discovery to defense attornies [sic] prior to Petitioner's trial or to date."  (Id.)  Petitioner also

provides a lengthy list of generic materials that were, according to him, "potentially crucial

exculpatory evidence."  (Id. at 109-112.)  For example, petitioner alleges that the prosecution

improperly failed to produce the following to the defense:

> Any and all records of requests, reports, surveillance video, audio
> recordings of conversations and interviews by personnel at the
> Santa Monica Police Department specifically in the vicinity of the
> Santa Monica Boardwalk and the adjacent residential area.
>
> * * *
>
> Any and all records of requests, reports, communications,
> surveillance video, cell phone snapshots of Petitioner, audio
> recordings and interviews with the Sugar Bowl Ski Resort
> management and/or employees or any law enforcement agency or
> agencies that involved Petitioner driving and parking his Sierra-
> GMC Pick-up at the Sugar Bowl Ski Resort Parking Lot.

(Id. at 110)

/////

Petitioner's claim that the prosecution failed to turn over exculpatory material to the defense is unduly vague and conclusory and federal habeas relief should be denied on that basis alone. "'Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.'" Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)). In short, petitioner's overly broad allegations in support of this claim of prosecutorial misconduct fail to state a cognizable claim for relief.

To the extent petitioner is arguing that the prosecution violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963), he has not established that he is entitled to relief. The United States Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. There are three components of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Comstock v. Humphries, 786 F.3d 701, 708 (9th Cir. 2015) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). See also Runningeagle v. Ryan, 686 F.3d 758, 769 (9th Cir. 2012). In order to establish prejudice, petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289. See also Runningeagle, 686 F.3d at 769.

A habeas petitioner must do more than "merely speculate" about the substance of the Brady material. Runningeagle, 686 F.3d at 769. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013) (quoting Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005) (in turn quoting United States v. Croft, 124 F.3d 1109, 1124 (9th Cir. 1997)). Thus, evidence is not "material" under Brady where the defendant has only "a hunch" that the evidence would be useful. United States v. Abonce–Barrera, 257 F.3d 959, 970 (9th Cir. 2001). See also Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting a Brady claim in part because the

petitioner's arguments were speculative).  Accordingly, "[f]or purposes of determining prejudice," therefore, "the withheld evidence must be analyzed 'in the context of the entire record.'"  Olsen, 704 F.3d at 1184 (quoting Benn v. Lambert, 283 F.3d 1040, 1053 (9th Cir. 2002) (in turn quoting Agurs, 427 U.S. at 112)).

Here, petitioner has done nothing more than speculate that production of all the material he suggests should have been produced to the defense would have led to a different result at his trial.  However, petitioner has completely failed to demonstrate that any particular item would have changed the outcome of these proceedings.  As explained above, mere speculation is an insufficient basis for establishing a Brady violation.  For these reasons, petitioner he is not entitled to federal habeas relief on this claim.[15]

**G.  Witness Tampering**

In petitioner's ninth ground for relief, he claims that there is "evidence of witness tampering" in connection with his case.  (ECF No. 1 at 114.)  Petitioner explains,

> there is considerable evidence at trial that there were violations of any sensible interviewing and interrogation methods.  There are indications from testimony at trial and reports from private investigators that existing reports may have been rewritten and/or falsified.

(Id.)  In particular, petitioner alleges that reserve officer Jerry Johnson, "who Petitioner assumes never advised any witness or potential witnesses that he was a reserve officer only and therefore never experienced a position of a full-time paid civil service position as a police officer in the State of California," did not have the "credibility and experience" to conduct the police investigation into this case.  Petitioner complains that Officer Johnson misled witnesses and other persons about his previous experience and expertise, used "unprofessional interviewing techniques," and gave witnesses and potential witnesses "an extraordinary amount of information about the case."  (Id.)  Petitioner further contends that there is evidence that "suggests" that

/////

---

[15]   Any claim that the prosecution violated state law in failing to provide discovery materials to the defense is, of course, not cognizable in this federal habeas corpus proceeding.  Estelle, 502 U.S. at 67-68; Park, 202 F.3d at 1149.

"statements that were given to Reserve Officer Jerry Johnson were falsified." (Id. at 115.)  For instance, petitioner alleges:

> Retired Sergeant Steve Butts advised at trial that his written report that described his initial contact with Petitioner was not his report. He stated the report that was given to him was typed and on the bottom of the report had his name typed.  Butz went on to say that he did not type his reports and was not aware of the typed report until recently.  The unanswered question of course is who wrote the report and typed Butz's name on it?  Retired Chief Willick was asked to enlighten the court concerning a possible explanation. However the Retired Chief had no explanation.  There no dates indicated [sic] at the bottom of the report to indicate when the report was typed, written or created.  There was also no approving supervisors [sic] signature to approve the report.  So the question remains as to who wrote the face sheet of a missing person report that was soon to turn into an alledged [sic] homicide report?  Was this report with an unknown author typed in 1982 or in 2004 prior to the Grand Jury Hearing.

(Id.)

Petitioner also alleges that Officer Johnson encouraged witnesses to "speak to each other" and to "look the case up on the internet," and that he also may have changed some of the original witness statements resulting from the initial investigation into Janet's disappearance.  (Id. at 116-20.)

All of petitioner's allegations in support of his claim based upon alleged witness tampering in connection with the underlying investigation concern the conduct of Officer Johnson.  Petitioner argues that Johnson "tamper[ed] with critical witnesses in a major case in order to gain witness testimony to favor his goal of a malicious unlawful prosecution." (Id. at 119-20.)  However, petitioner cites absolutely no case law in support of his claim for habeas relief based upon this alleged "witness tampering."

Petitioner's wide ranging and conclusory allegations fail to state a claim cognizable in these federal habeas corpus proceedings.  To the extent petitioner is attempting to raise a broad due process claim that Officer Johnson's actions during the investigation of the case and the subsequent trial rendered petitioner's criminal proceedings fundamentally unfair, he has failed to demonstrate any prejudice.  "Even where constitutional error is found, 'in § 2254 proceedings a court must [also] assess the prejudicial impact of constitutional error' under the Brecht [v.

1  Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993) ] standard." Dixon v.

2  Williams  750 F.3d 1027, 1034 (9th Cir. 2014) (citations omitted).  Under Brecht, a habeas

3  petitioner is entitled to relief only if "the error 'had substantial and injurious effect or influence in

4  determining the jury's verdict."  507 U.S. at 637.  None of the examples that petitioner provides in

5  support of this claim or the questions that petitioner raises concerning Officer Johnson's actions

6  rise to the level of a due process violation.  The incidents petitioner describes, even if true, could

7  not have had a "substantial and injurious effect or influence in determining the jury's verdict,"

8  given the extensive evidence introduced at his trial supporting the jury's verdict and the fact that

9  petitioner was convicted by the just who heard that evidence at trial.  Brecht, 507 U.S. at 619.

10  Nor is there any evidence that petitioner was found guilty based on the introduction of false

11  evidence. See Owens v. Foltz, 797 F.2d 294, 296 (6th Cir. 1986) ("In a habeas corpus review, a

12  court can reverse for inadequate investigation only when the petitioner can show a deprivation of

13  due process tantamount to a suppression of relevant evidence.")

14         The decision of the California Supreme Court rejecting petitioner's claim of "witness

15  tampering" was not contrary to or an unreasonable application of federal law.  Accordingly,

16  petitioner is not entitled to federal habeas relief with respect to this claim.

17         **H.  Ineffective Assistance of Trial and Appellate Counsel**

18         Petitioner raises one claim of ineffective assistance of trial counsel and one claim of

19  ineffective assistance of appellate counsel.  After setting forth the applicable legal standards, the

20  court will address both claims in turn below.

21         **1.  Legal Standards**

22         The clearly established federal law governing ineffective assistance of counsel claims is

23  that set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To

24  succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was

25  deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687.  Counsel is

26  constitutionally deficient if his or her representation "fell below an objective standard of

27  reasonableness" such that it was outside "the range of competence demanded of attorneys in

28  criminal cases." Id. at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so

1   serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" <u>Richter</u>, 562 at

2   104 (quoting <u>Strickland</u>, 466 U.S. at 687).  A reviewing court is required to make every effort "to

3   eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

4   challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

5   <u>Strickland</u>, 466 U.S. at 669.  <u>See</u> <u>also</u> <u>Richter</u>, 562 U.S. at 107 (same).  Reviewing courts must

6   "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

7   professional assistance."  <u>Strickland</u>, 466 U.S. at 689.  There is in addition a strong presumption

8   that counsel "exercised acceptable professional judgment in all significant decisions made."

9   <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u>, 466 U.S. at 689).  This

10  presumption of reasonableness means that the court must "give the attorneys the benefit of the

11  doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel

12  may have had for proceeding as they did."  <u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S. Ct.

13  1388, 1407 (2011) (internal quotation marks and alterations omitted).

14        The <u>Strickland</u> standards apply to appellate counsel as well as trial counsel.  <u>Smith v.</u>

15  <u>Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).

16  However, an indigent defendant "does not have a constitutional right to compel appointed counsel

17  to press nonfrivolous points requested by the client, if counsel, as a matter of professional

18  judgment, decides not to present those points."  <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983).

19  Counsel "must be allowed to decide what issues are to be pressed."  <u>Id.</u>  Otherwise, the ability of

20  counsel to present the client's case in accord with counsel's professional evaluation would be

21  "seriously undermined."  <u>Id.</u>  <u>See</u> <u>also</u> <u>Smith v. Stewart</u>, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)

22  (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even

23  particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless

24  arguments on a client's behalf.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 (requiring a showing of

25  deficient performance as well as prejudice).  Thus, appellate counsel is not deficient for failing to

26  raise a weak issue.  <u>See</u> <u>Miller</u>, 882 F.2d at 1434.  In order to establish prejudice in this context,

27  petitioner must demonstrate that, but for appellate counsel's errors, he probably would have

28  prevailed on appeal.  <u>Id.</u> at 1434 n.9.

## 2. Ineffective Assistance of Appellate Counsel

In his tenth ground for relief, petitioner claims that his appellate counsel rendered him ineffective assistance in failing to inform the California Court of Appeal that: (1) Jerry Johnson was only a reserve officer and therefore did not receive the training given to full time police officers; and (2) the family dog, Fuzz, was also a trained police canine and was therefore expected to exhibit exemplary behavior and discipline. (ECF No. 1 at 125.)

Petitioner notes that his appellate counsel referred to Johnson only as a "retired officer" and he argues that his counsel's failure to inform the California Court of Appeal that Johnson was actually merely a reserve officer and had not received the full training provided to full time police officers "may have been" a factor in the state appellate court's decision to uphold his judgment of conviction. (Id. at 126-27.) Petitioner argues that an accurate depiction of Johnson's status would have alerted the appellate court to "the unprofessional and inaccurate biased investigation that was prompted by the inexperience and questionable status that this so called reserve officer had with the Placer County Sheriff's Office." (Id. at 127.)

With regard to the family dog actually being a trained police canine, petitioner argues that his appellate counsel should have informed the California Court of Appeal that the dog had a "high level of expected obedience directly relate[d] to a public safety issue and a liability issue for the public agency if that canine does not perform at the highest level." (Id.) Petitioner argues that these facts "should have been instrumental in the Appellate court reversing the trial court's conviction." (Id.)

Respondent counters that, under state law, appellate counsel was precluded from citing facts that were not in the trial record.

Simply put, petitioner has failed to demonstrate any prejudice stemming from these claims of ineffective assistance of appellate counsel. There is no reasonable likelihood that, but for appellate counsel's alleged error in failing to advise the California Court of Appeal that Officer Johnson was a reserve officer and that Fuzz was a trained police canine, petitioner probably would have prevailed on his appeal in state court. Accordingly, petitioner is not entitled to federal habeas relief on his ineffective assistance of appellate counsel claim.

### 3. Ineffective Assistance of Trial Counsel

In his twelfth ground for relief, petitioner claims that his trial counsel rendered ineffective assistance in failing to investigate the whereabouts of Janet's mother, Jean Gregoire, for the first several days after Janet disappeared, as well as Gregoire's history of "violent behavior." (ECF No. 1 at 134.) Petitioner contends that the prosecution conducted interviews of Jean Gregoire in 1982 and that the transcripts of these interviews "should have disclosed Jean's location the first two or three nights of Janet's disappearance." (Id.) Petitioner notes that Janet's mother, Gregoire, was asked to take a polygraph test because petitioner had suggested to police that Gregoire was possibly "hiding [Janet] out." (Id. at 135.) Petitioner argues that "reports that lead up to the suggestion of the polygraph should have been disclosed to the defense. (Id.)

Petitioner also informs this court that a Placer County Superior Court judge denied Jean Gregoire's request for visitation rights to her grandchildren, because "he apparently felt the children would be in danger." (Id.) Petitioner points to an FBI interview with Gregoire's "distant supervisor," wherein the supervisor stated that Gregoire was a "hard core, neo-nazi type." (Id.) Petitioner provides several examples of incidents which he contends show that Gregoire was volatile and abusive to her daughter and antagonistic to petitioner, that Janet Kovacich frequently visited her mother's house, and that Jean Gregoire wanted her daughter to leave petitioner and flee to Europe. (Id. at 136-41.) Petitioner appears to be claiming, or at least suggesting, that his trial counsel rendered ineffective assistance in failing to conduct sufficient investigation into whether Jean Gregoire was responsible for Janet's death.

Petitioner's conclusory allegations that investigation into Jean Gregoire's whereabouts around the time of Janet's disappearance or Gregoire's reputation would have resulted in a different verdict in his case are insufficient to establish either deficient performance by his trial counsel or prejudice. See Jones, 66 F.3d at 205 ("conclusory suggestions" and "bald assertions" fall short of stating an ineffective assistance of counsel claim and do not entitle the petitioner to an evidentiary hearing). Likewise, a general assertion that further investigation by counsel may have uncovered exculpatory evidence is insufficient to establish prejudice. Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he

1   presented no evidence concerning what counsel would have found had he investigated further, or

2   what lengthier preparation would have accomplished).  Simply speculating, or baldly stating, that

3   further investigation would have led to evidence that could have led to a different verdict does not

4   establish prejudice.  Bible v. Ryan, 571 F.3d 860, 871 (9th Cir. 2009); Gonzalez v. Knowles, 515

5   F.3d 1006, 1015-16 (9th Cir. 2008) ("Such speculation is plainly insufficient to establish

6   prejudice.")

7        Petitioner has presented no evidence to this habeas court that his trial counsels' failure, if

8   any, to conduct investigation into Jean Gregoire's whereabouts around the time of Janet's

9   disappearance or Gregoire's prior actions was objectively unreasonable.  He has also certainly

10  failed to provide any evidence that Gregoire was responsible for the death of her daughter.  See

11  Strickland, 466 U.S. at 691 ("Counsel has a duty to make reasonable investigations or to make a

12  reasonable decision that makes particular investigations unnecessary.")  In addition, there is no

13  evidence before this court that petitioner's counsel did not conduct investigation into the areas

14  now suggested by petitioner and/or that he simply concluded that those areas of investigations

15  were not fruitful.  Of course, "counsel need not undertake exhaustive witness investigation."

16  Matylinsky v. Budge, 577 F.3d 1083, 1092 (9th Cir. 2009).  See also Mickey, 606 F.3d at 1237

17  ("At the same time, of course, counsel need not investigate interminably.")

18       Petitioner has failed to adequately allege or establish either deficient performance or

19  prejudice with respect to this claim of ineffective assistance of his trial counsel based on a failure

20  to investigate.  Accordingly, he is not entitled to federal habeas relief with respect to this claim.

21       **I.  Miranda Claim**

22       In his eleventh ground for relief, petitioner claims that he was never advised of his

23  constitutional rights pursuant to the decision in Miranda v. Arizona, 384 U.S. 436 (1966), even

24  though he was interviewed numerous times by law enforcement and his residence was searched

25  after Janet's disappearance.  (ECF No. 1 at 129.)  Petitioner claims that although he did not know

26  it at the time, he was considered a suspect in the crime during these law enforcement interviews.

27  (Id. at 129-32.)  Petitioner alleges that "during any one of these interrogations there were

28  absolutely no rights to counsel or rights to remain silent disclosed to the Petitioner."  (Id. at 130.)

1   Petitioner also notes that at one such interview, "the interrogation became heated, Petitioner got

2   up from the interrogation and left the building."  (Id.)

3        Respondent argues that petitioner's claim is conclusory and is not supported by the state

4   court record.  (ECF No. 28 at 44.)  Respondent also notes that petitioner did not raise any

5   arguments based on an alleged  Miranda violation at or prior to his trial.  Accordingly, according

6   to respondent, the record with regard to any such issue was not "properly developed."  (Id.)

7   Respondent also argues that petitioner has not established he was "in police custody" during any

8   of these interviews or that he was "not free to leave" at his first formal police interview conducted

9   on September 15, 1982.  (Id.)  Respondent points out that prior to the September 15, 1982

10  interview, petitioner spoke voluntarily with law enforcement and agreed to a search of his home.

11  (See Resp't's Lod. Doc. No. 24 at 2756-58.)  Respondent also notes that petitioner was never

12  arrested after the initial investigation into Janet's death and that the investigation was first closed

13  in 1983.  (ECF No. 28 at 44.)

14       In Miranda v. Arizona, the United States Supreme Court held that the Fifth Amendment

15  privilege against self-incrimination prohibits the admission into evidence of statements given by a

16  suspect during "custodial interrogation" without a prior warning.  384 U.S. at 444.  Custodial

17  interrogation means "questioning initiated by law enforcement officers after a person has been

18  taken into custody or otherwise deprived of his freedom of action in any significant way."

19  Miranda, 384 U.S. at 444.  "To determine whether an individual was in custody, a court must,

20  after examining all of the circumstances surrounding the interrogation, decide whether there [was]

21  a formal arrest or restraint on freedom of movement of the degree associated with a formal

22  arrest."  United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002) (alteration in original) (internal

23  quotation marks and citation omitted).  See also United States v. Craighead, 539 F.3d 1073, 1082

24  (9th Cir. 2008) (The court must "examine the totality of the circumstances surrounding the

25  interrogation.").

26       Whether a suspect is "in custody" for purposes of Miranda requires application of an

27  objective test.  J.D.B. v. North Carolina, ___ U.S. ___, ___, 131 S. Ct. 2394, 2402 (2011);

28  Yarborough v. Alvarado, 541 U.S. 652, 662-63 (2004).  The custody determination is not based

1   upon "the subjective views of the officers or the individual being questioned." Kim, 292 F.3d at

2   973.  Rather, two inquiries are necessary for a determination of an individual's "in custody" status

3   under this test:  (1) what were the overall circumstances surrounding the interrogation; and (2)

4   given those circumstances, would a reasonable person in the suspect's situation have felt free to

5   terminate the interrogation and leave.  J.D.B., 131 S. Ct. at 2402; Yarborough, 541 U.S. at 662-

6   63; Thompson v. Keohane, 516 U.S. 99, 112 (1995); Stansbury v. California, 511 U.S. 318, 322

7   (1994).

8              The Ninth Circuit has recently addressed this area, stating as follows:

9                   Facts relevant to the determination of whether a person is in
10                  custody "include the language used by the officers, the physical
                    characteristics of the place where the questioning occurs, the degree
11                  of pressure applied to detain the individual, the duration of the
                    detention, and the extent to which the person was confronted with
12                  evidence of guilt." United States v. Hernandez, 476 F.3d 791, 796
                    (9th Cir. 2007) (quoting United States v. Butler, 249 F.3d 1094,
13                  1099 (9th Cir. 2001)); accord United States v. Hayden, 260 F.3d
                    1062, 1066 (9th Cir. 2001) ("Factors relevant to whether an accused
14                  is 'in custody' include the following: (1) the language used to
                    summon the individual; (2) the extent to which the defendant is
15                  confronted with evidence of guilt; (3) the physical surroundings of
                    the interrogation; (4) the duration of the detention; and (5) the
16                  degree of pressure applied to detain the individual.").  "While
                    determining whether a defendant is constitutionally entitled to
17                  Miranda warnings is subject to de novo review, it is nevertheless a
                    fact-intensive inquiry." United States v. Wright, 625 F.3d 583, 602
18                  (9th Cir.2010) (citing Craighead, 539 F.3d at 1082, 1084).

19  United States v. Cazares, 788 F.3d 956, 980-81 (9th Cir. 2015).

20              Here, petitioner has failed to show that he was "in custody" for purposes of the Miranda

21  rule at the time of any of his interactions with police after Janet disappeared.  Although petitioner

22  provides some details from two of these police interviews, the facts he highlights do not establish

23  that he was "in custody" at the time they took place.  For instance, petitioner notes that Chief

24  Willick testified that in the first several days after Janet's disappearance the police "had some

25  reason to possibly suspect Mr. Kovacich" and that the investigation was initiated "as a homicide."

26  (ECF No. 1, Exs. 88, 89.)  However, as noted above, whether petitioner was "in custody" for

27  purposes of Miranda analysis is not based on the subjective views of the questioning officers.

28  Petitioner has come forward with no evidence suggesting that a reasonable person in his

1    circumstances would have believed he was not free to "terminate the interrogation and leave"

2    during those interviews with law enforcement.  See J.D.B., 131 S. Ct. at 2402.  See also Howes v.

3    Fields, ___U.S.___, ___, 132 S. Ct. 1181, 1189 (2012).  Specifically, petitioner has failed to show

4    that he was prevented from leaving the interrogation room, that he was subjected to lengthy

5    questioning, that he was physically restrained, or that he was told he was required to answer

6    questions.  Indeed, petitioner himself states that after one of the interview sessions became

7    heated, he simply left the police station.  This implies that petitioner reasonably believed he was,

8    and was in fact, free to leave.  Finally, having failed to show that Miranda warnings were called

9    in connection with his law enforcement interviews, petitioner fails to show that any evidence

10   obtained from an unlawful interrogation was introduced at his trial or played any part in his

11   conviction.

12        Petitioner's conclusory allegations that police officers violated the Miranda rule during his

13   interrogations in 1982 are insufficient to demonstrate his entitlement to federal habeas relief with

14   respect to this claim.  Jones, 66 F.3d at 204; James, 24 F.3d at 26.

15        **J.  Juror Misconduct**

16        In petitioner's fourteenth ground for relief, he claims that his rights under the Sixth and

17   Seventh Amendments were violated by juror misconduct.  (ECF No. 1 at 151.)  He explains:

18
>    Although numerous jurors would be sleeping during trial, it was at
19   one point that apparently the only African-American Female on the
>    jury (lower seat/middle of the row) approached the bench during a
20   break in trial to inform the presiding judge that she apologized for
>    falling asleep during trial as she had just flown in from Chicago.
21   Petitioner applauds the juror's honesty and concern, but cannot help
>    but question the presiding Judge's lack of interest in the Petitioner's
22   violation of his Constitutional Rights to a fair trial.  The presiding
>    Judge, to Petitioner's knowledge failed to attempt to correct the
23   flagrant inattentiveness of the jury.

24   (Id.)

25        The Sixth Amendment right to fair and impartial jury requires that jurors be "capable and

26   willing to decide a case solely on the evidence before it."  United States v. Olano, 507 U.S. 725,

27   738 (1993) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  See also Irvin v. Dowd, 366

28   U.S. 717 (1961).  A juror who falls asleep during trial is not, however, per se incompetent.  See

1    Tanner v. United States, 483 U.S. 107, 126–27 (1987); United States v. Springfield, 829 F.2d

2    860, 864 (9th Cir. 1987).  A sleeping juror only rises to the level of a constitutional violation

3    requiring a new trial if the juror missed essential portions of the trial and thus was unable to fairly

4    consider the evidence.  United States v. Barrett, 703 F.2d 1076, 1083 n.13 (9th Cir. 1983)

5    ("[E]ven if the juror in the present case is found to have been asleep during portions of the trial, a

6    new trial may not be required if he did not miss essential portions of the trial and was able fairly

7    to consider the case.").

8          Here, petitioner fails to identify the "numerous jurors" he now alleges were sleeping

9    during his trial and there is no evidence in the record before this court that any of the jurors at

10   petitioner's trial missed essential, or any, portions of the trial.  Although petitioner identifies one

11   specific juror who informed the judge that she fell asleep during one point in the trial, he also fails

12   to show with respect to this juror that she missed any essential portions of the trial and/or was

13   unable to fairly consider the evidence.  Under these circumstances, petitioner has failed to

14   demonstrate that his right to a fair and impartial jury was violated by juror misconduct.

15         The California Supreme Court's denial of petitioner's juror misconduct claim is not an

16   unreasonable determination of the facts or contrary to clearly established federal law.

17   Accordingly, petitioner is also not entitled to federal habeas relief on this claim.

18   **IV.  Conclusion**

19         For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

20   application for a writ of habeas corpus be denied.

21         These findings and recommendations are submitted to the United States District Judge

22   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23   after being served with these findings and recommendations, any party may file written

24   objections with the court and serve a copy on all parties.  Such a document should be captioned

25   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26   shall be served and filed within fourteen days after service of the objections.  Failure to file

27   objections within the specified time may waive the right to appeal the District Court's order.

28   Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated:  August 14, 2015

Dale A. Drozd

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
Kovacich985.hc